v02526.cp1

















NUMBER 13-02-526-CV

COURT OF APPEALS

THIRTEENTH DISTRICT OF TEXAS

CORPUS CHRISTI - EDINBURG 
                                                                                                                      

BRIDGESTONE CORPORATION
ET AL.,                                                                                 Appellants,

v.

JUAN MACIAS LOPEZ, ET AL.,                                                 Appellees.
                                                                                                                                      

On appeal from the 319th District Court of Nueces County, Texas.
                                                                                                                      

O P I N I O N

Before Justices Hinojosa, Yañez, and Garza
Opinion by Justice Yañez
 

          In a single issue, appellant Bridgestone Corporation (“Bridgestone”) contends the
trial court erred in denying its special appearance. See Tex. Civ. Prac. & Rem. Code Ann.
§ 51.014(a)(7) (Vernon Supp. 2004); Tex. R. App. P. 28.1. We affirm.
Background
          This interlocutory appeal arises out of a single-vehicle automobile crash which
occurred in Mexico on August 3, 2000. Appellees (plaintiffs below),


 filed suit against
Bridgestone, General Motors Corporation (“GM”), and Bridgestone/Firestone North
American Tire, L.L.C. (“Firestone”),


 contending that defects in the vehicle and tire caused
the accident. The tire at issue was manufactured and sold by Bridgestone/Firestone de
Mexico, S.A. de C.V.,


 a Mexican corporation that was then a subsidiary of Firestone. At
the time of the lawsuit, Firestone was a wholly-owned subsidiary of Bridgestone, a
Japanese corporation.
          Appellees’ allegations against Bridgestone include claims that Bridgestone and
Firestone are operated as a single business enterprise. Appellees argue that the evidence
establishing an interconnection between Bridgestone and Firestone includes: (1) the use
of common personnel; (2) the use of common facilities; (3) the use of centralized
accounting and an unclear allocation of profits and losses; (4) the payment of wages and
the rendition of services by one corporation for the other corporation; and (5) the use of a
common business name. See El Puerto de Liverpool v. Servi Mundo Llantero S.A. de
C.V., 82 S.W.3d 622, 637 (Tex. App.–Corpus Christi 2002, pet. dism’d w.o.j.) (op. on reh’g)
(listing factors relevant to determining existence of single business enterprise); Paramount
Petroleum Corp. v. Taylor Rental Ctr., 712 S.W.2d 534, 536 (Tex. App.–Houston [14th
Dist.] 1986, writ ref'd n.r.e.) (same). 
          Bridgestone filed a special appearance on January 24, 2001, contending that Texas
courts did not have general or specific jurisdiction. Following a hearing on August 15,
2002, the trial court denied the special appearance, and this interlocutory appeal ensued. 
See Tex. Civ. Prac. & Rem. Code Ann. § 51.014(a)(7) (Vernon Supp. 2004).
          On October 28, 2002, the trial court entered untimely findings of fact and
conclusions of law. See Tex. R. App. P. 28.1. 
Standard of Review 
          The plaintiff bears the initial burden of pleading sufficient allegations to bring a
nonresident defendant within the provisions of the long-arm statute. Am. Type Culture
Collection, Inc. v. Coleman, 83 S.W.3d 801, 806 (Tex. 2002); BMC Software Belg., N.V.
v. Marchand, 83 S.W.3d 789, 793 (Tex. 2002). To prevail in a special appearance, a non-resident defendant bears the burden of negating all bases of personal jurisdiction alleged
by the plaintiff. Coleman, 83 S.W.3d at 806; BMC Software, 83 S.W.3d at 793; EMI Music,
Mex., S.A. de C.V. v. Rodriguez, 97 S.W.3d 847, 853 (Tex. App.–Corpus Christi 2003, no
pet.). 
          Whether a court has personal jurisdiction over a defendant is a question of law. 
Coleman, 83 S.W.3d at 805-06; BMC Software, 83 S.W.3d at 794. In determining the
question of personal jurisdiction, however, a trial court must frequently resolve questions
of fact. BMC Software, 83 S.W.3d at 794. Where, as here, a trial court enters an order
denying a special appearance and issues findings of fact and conclusions of law, the
appellant may challenge the fact findings on legal and factual sufficiency grounds. Id. The
courts of appeals may review the fact findings for both legal and factual sufficiency. Id.;
see also El Puerto, 82 S.W.3d at 639. 
          Appellate courts review the trial court’s conclusions of law de novo. BMC Software,
83 S.W.3d at 794; EMI, 97 S.W.3d at 853; El Puerto, 82 S.W.3d at 639. An appellant may
not challenge a trial court’s conclusions of law for factual insufficiency; however, the
reviewing court may review the trial court’s legal conclusions drawn from the facts to
determine their correctness. BMC Software, 83 S.W.3d at 794. If the reviewing court
determines a conclusion of law is erroneous, but the trial court rendered the proper
judgment, the erroneous conclusion of law does not require reversal. Id. We examine the
entire record, not just the evidence in support of the trial court’s legal conclusion. 
Valsangiacomo v. Americana Juice Import, 35 S.W.3d 201, 205 (Tex. App.–Corpus Christi
2000, pet. dism’d w.o.j.). For legal sufficiency points, if there is more than a scintilla of
evidence to support the finding, the no evidence challenge fails. BMC Software, 83
S.W.3d at 795. 
Applicable Law
          In Texas, a party may contest personal jurisdiction by filing a special appearance. 
Tex. R. Civ. P. 120a(1). A special appearance is determined by reference to the pleadings,
any stipulations made by and between the parties, any affidavits and attachments filed by
the parties, discovery, and any oral testimony. Tex. R. Civ. P. 120a(3).
          A Texas court may assert personal jurisdiction over a nonresident defendant only 
(1) when the Texas long-arm statute authorizes the exercise of jurisdiction and (2) when
the exercise is consistent with the due process guarantees embodied in both the United
States and Texas constitutions. EMI, 97 S.W.3d at 854. The long-arm statute authorizes
jurisdiction over a nonresident defendant “doing business” in Texas. Tex. Civ. Prac. &
Rem. Code Ann. § 17.042 (Vernon 1997).


 The Texas long-arm statute allows a court to
exercise personal jurisdiction over a nonresident defendant “as far as the federal
constitutional requirements of due process will allow.” EMI, 97 S.W.3d at 854.
          Due process permits a state court to exercise personal jurisdiction over a defendant
only if the defendant has some minimum, purposeful contacts with the state, and the
exercise of jurisdiction will not offend traditional notions of fair play and substantial justice. 
Id. A nonresident that purposefully avails itself of the privileges and benefits of conducting
business in Texas is amenable to a suit in Texas. Id. However, a nonresident will not be
subject to Texas jurisdiction based upon mere random, fortuitous, or attenuated contacts.
Id. Minimum contacts are particularly important when the defendant is from a different
country because of the unique and onerous burden placed on a party called upon to
defend a suit in a foreign legal system. Id. 
          A defendant’s contacts with a forum can give rise to specific or general jurisdiction. 
Id. at 654-55. Specific jurisdiction is established if the defendant's alleged liability arises
from or is related to an activity conducted within the forum. Id. at 655. The activity must
be purposefully directed at Texas so the defendant could foresee being haled into court
here. Id. The number of the defendant’s contacts is not controlling; rather, the quality and
nature of these contacts are the important factors. Id. When specific jurisdiction is
asserted, the minimum contacts analysis focuses on the relationship between the
defendant, the forum, and the litigation. Id. A single contact with Texas, of substantial
quality and nature, may be sufficient to establish specific jurisdiction when the cause of
action arises from that contact. Id. A substantial connection must exist between the
contact and the cause of action in the forum state. Id. The concept of “foreseeability” is
implicit in the requirement that there be a “substantial connection” between the nonresident
defendant and Texas arising from action or conduct of the nonresident defendant
purposefully directed toward Texas. Id.
          When general jurisdiction is alleged, there must be continuous and systematic
contacts between the nonresident defendant and Texas. Id. Such contacts would permit
Texas courts to exercise personal jurisdiction over the defendant even if the cause of
action did not arise from or relate to activities conducted within the state. Id. General
jurisdiction requires a showing of substantial activities by the nonresident defendant in
Texas, a more demanding minimum contacts analysis than for specific jurisdiction. Id. 
          Upon finding that the nonresident defendant purposefully established minimum
contacts with the forum state sufficient to support the exercise of either specific or general
jurisdiction, we must then determine if the exercise of in personam jurisdiction comports
with fair-play and substantial justice. Id. In making this determination, we consider: (1) the
burden on the nonresident defendant; (2) Texas's interest in adjudicating the dispute; (3)
the plaintiff's interest in getting convenient and effective relief; (4) the interstate judicial
system's interest in obtaining the most efficient resolution of the controversy; and (5) the
states' shared interest in furthering fundamental substantive social policies. Id. When an
international dispute is involved, the following factors should also be considered: (1) the
unique burdens placed upon the defendant who must defend itself in a foreign legal
system; and (2) the procedural and substantive policies of other nations whose interests
are affected as well as the foreign government's interest in its foreign relation policies. Id. 
Consideration of the fair-play analysis is separate and distinct from the minimum contacts
issue, but it is unlikely the exercise of jurisdiction will fail the fair-play analysis because the
minimum contacts analysis encompasses so many considerations of fairness. Id. 
Analysis
          The trial court made one hundred findings of fact and conclusions of law. 
Bridgestone challenges all but seven of the trial court’s findings and conclusions on
grounds that they are either immaterial or are not supported by legal or factually sufficient
evidence.



          The trial court’s findings of fact and conclusions of law include the following:
24. Bridgestone owns, and thereby controls, the copyright for a Bridgestone
website that advertises its U.S. presence along with its Japanese made
products sold in Texas and the U.S.
 
. . . . 
 
42. Bridgestone facilities in Texas receive support from Bridgestone’s
flagship technical center in Tokyo through exchanges of personnel and
technology.
 
43. Bridgestone, “as part of the unification of accounting policies,” amortized
the good will of Firestone. 
 
44. Bridgestone extended 1.3 billion dollars to prop up its U.S. operations
after the well publicized recall of Firestone tires.
 
45. Bridgestone reported a 750 million dollar special provision to include
provisions for the tire recall and possible legal liabilities.
 
46. Bridgestone and Firestone report via centralized accounting and have
an unclear allocation of profits and losses between themselves.
 
47. Bridgestone’s profits and losses are directly tied to Firestone.
 
48. Bridgestone claims property in Texas.
 
49. Bridgestone’s copyrighted website lists a synthetic rubber plant in
Orange, Texas as one of “Bridgestone’s principal plants worldwide.”
 
. . . .
 
51. Bridgestone and Firestone claim common offices or facilities.
 
52. Both Bridgestone and Firestone claim the Texas proving grounds.
 
53. Bridgestone and Firestone share common personnel.
 
54. Bridgestone and its wholly owned U.S. subsidiaries, including Firestone,
regularly trade or share employees, officers and directors.
 
55. At the hearing, Bridgestone did not dispute Judge Janis Graham Jack’s
finding that “ten different people have served on the board of directors for
both entities,” some of whom “served both companies simultaneously” when
that finding was raised in open court.
 
56. Bridgestone conceded in open court that Bridgestone’s Masatoshi Ono
served simultaneously with Bridgestone and Firestone.
 
57. Hiroyuki Kita served Firestone as C.E.O. and President while serving
Bridgestone as Vice-President.
 
58. John Lampe served Firestone as C.E.O. and President while serving
Bridgestone as a Director.
 
59. Kazz Nishigai served Firestone as Plant Manager before and after
serving Bridgestone at its Tokyo technical center and as Plant Manager in
Japan.
 
60. Akira Nozawa served Firestone as Treasurer after serving Bridgestone
in the same capacity.
 
61. Bridgestone’s top executives worked with Firestone’s top executives to
improve Firestones [sic] quality control procedures.
 
62. Bridgestone paid personnel performed services for Firestone.
 
63. Firestone provides U.S. market analysis and advertising services on
behalf of Bridgestone as part of the integrated effort to achieve the business
purpose of promoting Bridgestone tires in the U.S.
 
64. Bridgestone sets the management policies of the subsidiary companies
with a network of Bridgestone personnel advising the subsidiaries, including
those companies that have undisputed contacts with Texas, such as
Firestone, and including the plant where the tire at issue was made.
 
65. Bridgestone employees sets [sic] quality control policy for the subsidiary
companies, including those companies that have undisputed contacts with
Texas, such as Firestone, and including the plant where the tire at issue was
made.
 
66. Bridgestone has established a pattern of assigning its advisors from
Japan to different departments within subsidiary companies, including those
companies that have undisputed contacts with Texas, such as Firestone, and
including the plant where the tire at issue was made.
 
. . . .
 
69. Bridgestone representatives actively participated in training employees
and in overseeing and managing manufacturing activities in connection with
the recently publicized tread separation fatalities.
 
70. Bridgestone controls managerial policy at its subsidiaries through the
practice of installing members of Bridgestone’s Board of Directors as CEOs
of Bridgestone’s subsidiary companies.
 
. . . . 
 
74. Bridgestone has set up a committee of top executives from the parent
company and Firestone to oversee the rebuilding of the U.S. tire brands,
focusing on quality improvements and mounting a public relations campaign
that includes a money-back guarantee on new tires.
 
. . . .
 
76. Bridgestone expressly benefits from numerous settlement agreements
in Texas, which elect Texas law as the governing law, and these settlements
are expressly intended by the parties to protect Bridgestone from liability in
other similar tire failure law suits.
 
. . . .
 
79. Bridgestone and Firestone share a common business name.
 
. . . .
 
83. In response to Hiroyuki Kita’s statement that Bridgestone does not
derive substantial revenue from goods used in the U.S., Judge Barker, the
judge presiding over the Bridgestone/Firestone MDL action in the Southern
District of Indiana, noted in her order denying Bridgestone’s Motion to
Dismiss that, “This statement must come to a complete surprise to
Bridgestone’s shareholders, especially in light of Bridgestone’s 1998 Annual
Report, which reported that Bridgestone’s sales in the Americas (which, of
course, includes the U.S.) amounted to consolidated operating profit of $546
million and accounted for 31.1% of its ‘total operating profit before
eliminations for consolidation.’”
 
84. Judge Janis Graham Jack’s Order Denying Defendant Bridgestone
Corporation’s Motion to Reconsider Motion to Dismiss for Lack of Personal
Jurisdiction, found that, “Contrary to Mr. Kita’s assertions, there is evidence
of significant operating capital and other financial assistance being provided
by Bridgestone to Bridgestone/Firestone.”
 
. . . .
 
88. Bridgestone has failed to supply the court with credible evidence
sufficient to meet its burden of negating all bases of personal jurisdiction.
 
. . . .
 
90. Bridgestone and Firestone are not operated as separate entities, but
rather integrate their resources to achieve a common business purpose.
 
91. Bridgestone and Firestone operate as a single business enterprise as
the term is recognized under Texas law.
 
92. Bridgestone, through its wholly owned subsidiary, Firestone, has
engaged in continuous, systematic, and extensive activities within Texas.
 
93. Bridgestone has an unusually high degree of influence in the
management policies of its subsidiaries, including Firestone.
 
94. Bridgestone has established the requisite minimum contacts with Texas
to establish this court’s jurisdiction over Bridgestone.
 
. . . .
 
99. This court has general jurisdiction over Bridgestone.
 
100. This court’s exercise of jurisdiction comports with traditional notions of
fair play and substantial justice. 
 
Single Business Enterprise
 
          In their first amended original petition, appellees alleged that Bridgestone had done
business in Texas by participating in research, development, design, marketing, testing,
inspection, and evaluation of Firestone tires. Appellees also asserted that Bridgestone and
Firestone are operated as a single business enterprise. 
          The Texas Supreme Court has not addressed the “single business enterprise”
concept in any detail and recently declined to decide whether the “single business
enterprise” theory is a necessary addition to Texas law for disregarding corporate structure. 
See S. Union Co. v. City of Edinburg, 2003 Tex. LEXIS 518 at *34-*37 (Oct. 31, 2003). 
          The “single business enterprise” theory is an equitable doctrine applied to reflect
partnership-type liability principles when corporations integrate their resources and
operations to achieve a common business purpose. El Puerto, 82 S.W.3d at 636-37; N.
Am. Van Lines, Inc. v. Emmons, 50 S.W.3d 103, 119 (Tex. App.–Beaumont 2001, pet.
denied); Aluminum Chems. (Bolivia), Inc. v. Bechtel Corp., 28 S.W.3d 64, 68 (Tex.
App.–Texarkana 2000, no pet.). Several non-exhaustive factors can be considered to
determine whether corporations have been maintained as separate entities. See El
Puerto, 82 S.W.3d at 637 (listing factors); Paramount, 712 S.W.2d at 536 (same). The
factors include whether the corporations have “common employees; common offices;
centralized accounting; payment of wages by one corporation to another corporation's
employees; common business name; services rendered by the employees of one
corporation on behalf of another corporation; undocumented transfers of funds between
corporations; and unclear allocation of profits and losses between corporations.” El
Puerto, 82 S.W.3d at 637; Paramount, 712 S.W.2d at 536. 
          The “single business enterprise” theory is not synonymous with the doctrine of “alter
ego.” Bechtel, 28 S.W.3d at 68. Although the “alter ego” theory and “single business
enterprise” theory are both equitable doctrines, an important distinction is that the “alter
ego” theory generally involves proof of fraud, i.e., proof that the corporation is organized
and operated as merely a tool or business conduit of another corporation. Emmons, 50
S.W.3d at 119. “To recover under a finding of a single business enterprise, no proof of
fraud is required; instead, the single business enterprise theory relies on equity analogies
to partnership principles of liability.” Id. 
          Appellees argue that the evidence supporting their claim that Bridgestone and 
Firestone are operated as a single business enterprise includes the following: (1) the use
of common personnel; (2) the use of common facilities; (3) the use of centralized
accounting and an unclear allocation of profits and losses; (4) the payment of wages and
the rendition of services by one corporation for the other corporation; and (5) the use of
a common business name. We will examine, in turn, the trial court’s findings regarding
these factors and the evidence related to appellees’ claims.
1. Common personnel 
          Appellees cite findings of fact 53 through 60, plus findings 65 and 66, as supporting
their contention that Bridgestone and Firestone used common personnel. Appellees direct
us to the following evidence in support of the trial court’s findings of fact concerning the use
of common personnel.
          Appellees point to information contained on Bridgestone’s website, which includes
the following:
Bridgestone verifies technological advances in tires at eight proving grounds
on four continents– in Texas and Ohio in the United States and Mexico,
Brazil, Italy, and Thailand, as well as in Japan. The technical centers and
proving grounds in North America and Europe develop new tires for ever-changing needs in their markets. Those facilities receive support from
Bridgestone’s flagship technical center in Tokyo through exchange of
personnel and technology.
. . . .
Teamwork in raising productivity and quality unfolds across borders. 
Bridgestone stimulates continuing gains in productivity, quality, and working
conditions at its plants worldwide through exchanges of personnel and ideas.
 
(emphasis added).
 
          Appellees also cite the testimony of Robert Martin, who served as Firestone’s Vice
President of Quality Assurance when he retired in April of 2000. Martin testified that after
Bridgestone acquired Firestone, it engaged in a pattern of assigning Bridgestone advisors
to various departments at Firestone. During his career at Firestone involving matters of
quality assurance, Martin had a Japanese advisor, Rocky Nishiyama, who communicated
with Bridgestone and reported directly to Martin. Martin testified that Bridgestone directed
Firestone to make changes in its quality assurance procedures. Martin testified that
Masatoshi Ono, former CEO of Firestone, as well as other Firestone executives, also
served on Bridgestone’s board of directors. 
          Appellees also cite news releases which support their contention that Bridgestone
and Firestone regularly traded or shared employees, officers, and directors. The record
includes a February 22, 2001 Firestone news release supporting finding of fact 58, which
states that John Lampe served Firestone as C.E.O. and President while serving
Bridgestone as a Director. The news release notes that since being named Firestone
chairman, C.E.O. and President in October 2000, Lampe said he had “received immense
support from Bridgestone’s management team.” An October 10, 2000 Firestone news
release announcing Lampe’s promotion as chairman, C.E.O. and president of Firestone,
notes that Lampe’s predecessor, Masatoshi Ono, was returning to Bridgestone after
serving Firestone as C.E.O. and president for approximately ten years. The news release
states that during his tenure as chairman and C.E.O. of Firestone, Ono also served as
executive vice-president of Bridgestone. The same news release states that upon his
appointment, Lampe’s new Firestone “management team” would include Isao Togashi,
then a senior vice president for Bridgestone. The record also includes a December 19,
2001 Firestone news release supporting finding of fact 59, which states that Kazz Nishigai
served Firestone as plant manager before and after serving Bridgestone at its Tokyo
technical center and as plant manager in Japan. 
          Appellant contends there is “no evidence” that any officer functioned in the same
capacity for both Bridgestone and Firestone. Bridgestone cites BMC Software in support
of its argument that it is permissible for there to be common ownership and directorship
between a parent and its subsidiary, and that an overlap of corporate officers is
commonplace. See BMC Software, 83 S.W.3d at 799 (subsidiary corporation will not be
regarded as alter ego of parent merely because of stock ownership, duplication of some
or all of directors or officers, or exercise of control that stock ownership gives to
stockholders). Bridgestone points to the affidavit of Hiroyuri Kita, manager of Bridgestone’s
corporate legal department, which states that Bridgestone and Firestone are separate
corporations, each of which conducts its own separate shareholder and board of directors
meetings. 
          In BMC Software, the Texas Supreme Court held that there was no evidence to
support the trial court’s conclusion that one corporation was the alter ego of another
corporation. See id. at 799-800. The court noted that to “fuse” a parent company and its
subsidiary for jurisdictional purposes, “plaintiffs must prove the parent controls the internal
business operations and affairs of the subsidiary.” See id. at 799. BMC Software
discusses evidence offered by the plaintiff to support his “alter ego” theory. See id. Here,
however, appellees have alleged a “single business enterprise” theory, not an “alter ego”
theory. Thus, we find BMC Software inapposite. 
          After reviewing all of the evidence, we hold that the evidence is legally and factually
sufficient to support the trial court’s findings 53, 54, 58, 59, and 66. Thus, we hold that the
evidence is sufficient to establish that Bridgestone and Firestone used common personnel.
 
2. Common offices and facilities
          Appellees cite findings of fact 48, 49, 51, and 52 in support of their contention that
Bridgestone and Firestone share common offices and facilities. Appellees direct us to the
following evidence in support of the trial courts’ findings concerning common offices and
facilities.
           Appellees point to information on Bridgestone’s website, which states, in pertinent
part:
The Tokyo Technical Center anchors a global R&D network. That network
also includes technical centers in Akron, Ohio, and in Rome, along with
proving grounds and test courses in Tochigi and Hokkaido, Japan; Texas
and Ohio, U.S.A. and Mexico, Italy, Brazil, Thailand, and Indonesia.
 
The website also states:

Bridgestone verifies technological advances in tires at eight proving grounds
on four continents– in Texas and Ohio in the United States and in Mexico,
Brazil, Italy, and Thailand, as well as in Japan. The technical centers and
proving grounds in North America and Europe develop new tires for ever-changing needs in their markets. Those facilities receive support from
Bridgestone’s flagship technical center in Tokyo through exchanges of
personnel and technology.
 
          The record reflects that on one section of Bridgestone’s website, the proving
ground located in Texas is pictured, but is identified as “Bridgestone/Firestone’s proving
ground in Texas.” In another section of the website, however, listing “The Americas Non-Tire Plants,” the synthetic rubber plant in Orange, Texas is listed. 
          Appellant argues that there is “no evidentiary support” for appellees’ contention that
Bridgestone and Firestone share common offices and facilities. It argues that the
“misconstruing of Bridgestone’s website does not support such a finding.” 
          After reviewing all of the evidence, we hold that the evidence is legally and factually
sufficient to support numbers 48, 51, and 52 of the trial court’s findings. Thus, we hold
that the evidence is sufficient to establish that Bridgestone and Firestone used common
offices and facilities. 
3. Centralized accounting and an unclear allocation of profits and losses
          Appellees cite findings 43 through 47, plus findings 76, 83, and 84 in support of
their contention that Bridgestone and Firestone’s financial information is characterized by
a centralized accounting system and an unclear allocation of profits and losses. In
support, appellees point to evidence detailed below. 
          A Bridgestone statement entitled “Consolidated Financial Data,” showing net sales,
net earnings, and total assets for the years 1995 through 1999, contains a statement
providing that “[a]s a part of the unification of accounting policies, the figure for net income
includes the amortization of remaining goodwill mainly associated with the acquisition of
The Firestone Tire Rubber Co.” Appellees point to a news release, dated December 14,
2000, containing the remarks of then-President and C.E.O. of Bridgestone, Yoichiro
Kaizaki, in which Kaizaki notes that Bridgestone’s after-tax earnings will reflect a 750
million dollar “special provision, which includes the provisions at Bridgestone/Firestone for
recall costs and possible legal liabilities.” A separate news release, also dated December
14, 2000, entitled “Revised Projections for Consolidated Financial Results” states that
Bridgestone’s sales and profit will be lower than expected in part because of a decline in
tire sales due to the voluntary recall by Bridgestone’s U.S. subsidiary. A Bridgestone
news release dated December 4, 2001 notes that Bridgestone will provide BFAH


 with a
capital infusion of $1.3 billion in January 2002. The same news release notes that
Bridgestone’s net earnings are expected to increase significantly from the net earnings
projected in August 2001 “due to the impact of certain tax benefits related to the write-down of the assets of BFAH and the other special charges that will be taken in 2001.” 
Appellees also point to evidence that Bridgestone donated $1 million to the American Red
Cross in response to the terrorist attacks against the United States in September 2001. 
        The record contains Bridgestone’s 1998 and 1999 Annual Reports. The “Notes to
Consolidated Financial Statements” to the 1998 Annual Report state that “[t]he
consolidated financial statements include the accounts of the Company [Bridgestone] and
all of its subsidiaries.” The 1998 Annual Report includes a report from Asahi & Company,
certified public accountants, stating that it audited the accompanying consolidated balance
sheets of Bridgestone and its consolidated subsidiaries and that the consolidated financial
statements reflect the consolidated financial position of Bridgestone and its consolidated
subsidiaries. Similarly, the notes to Bridgestone’s 1999 Annual Report state that “[t]he
consolidated financial statements include the accounts of the Company and all of its
subsidiaries in which the Company has effective control.”
          Appellant contends there is “no evidence” of centralized accounting. Appellant
again points to affidavits by Hiroyuki Kita, which state that “Bridgestone Corporation,
Bridgestone/Firestone, Inc. and Bridgestone/Firestone de Mexico, S.A. keep separate
books and accounts and file separate tax returns.” Appellant again cites BMC Software
in support of its argument that Bridgestone’s annual reports are of “no legal
consequence.” See id. In conducting an analysis under an “alter ego” theory, the Texas
Supreme Court in BMC Software found that a subsidiary corporation’s annual report
contained insufficient evidence to support an inference that its parent corporation
considered the subsidiary’s revenue as its own. See id. In the case before us, however, 
we find that the record contains sufficient evidence to support an inference that
Bridgestone considered Firestone’s profits and losses as its own. Moreover, as noted, we
find appellant’s reliance on BMC Software misplaced because appellees have alleged a
“single business enterprise” theory, not an “alter ego” theory. 
          After reviewing all of the evidence, we hold that the evidence is legally and factually
sufficient to support the trial court’s findings 43 through 47. Thus, we hold that the
evidence is sufficient to establish that Bridgestone and Firestone engaged in centralized
accounting practices. 
4. Payment of wages and rendition of services by one corporation for the other
          Appellees cite findings of fact 61 through 63, 69, and 74 in support of their
contention that Bridgestone and Firestone engaged in payment of wages and rendition
of services for each other. 
          In support, appellees cite a newspaper article dated April 6, 2001 from The Detroit
News, in which Shigeo Watanabe, then-president of Bridgestone, is quoted as follows:
“Bridgestone has set up a committee of top executives from the parent company and
Bridgestone/Firestone to oversee the rebuilding of the U.S. brand, focusing on quality
improvements and mounting a public relations campaign that includes a money-back
guarantee on new tires.” 
          Appellees also point to statements made by Yoichira Kaizaki, Bridgestone’s
outgoing president and C.E.O. in January 2001, which state that Bridgestone’s “most
pressing management issue” is the revitalization of Firestone, its U.S. subsidiary. Robert
Martin testified that after Bridgestone acquired Firestone, there was a pattern of assigning
advisors from Bridgestone to different departments at Firestone. He further testified that
Bridgestone provided guidance to Firestone officials regarding quality assurance practices
and procedures. 
          Appellant argues that there is no evidence that one corporation provided services,
without remuneration, to the other “in any sense that matters with respect to corporate
separateness.”
          After reviewing all of the evidence, we conclude the evidence is legally and factually
sufficient to support the trial court’s findings 61 through 63, 69 and 74. Thus, we hold the
evidence is sufficient to establish that Bridgestone and Firestone employees each
rendered services on behalf of the other corporation.
5. Common business name
          As noted, at the time this lawsuit was filed, Bridgestone/Firestone, Inc. (Firestone),
a United States corporation, was a wholly-owned subsidiary of Bridgestone, a Japanese
corporation. Thus, the two corporations shared “Bridgestone” as a common business
name. As discussed above, Bridgestone’s annual financial reports contain consolidated
financial data from its various subsidiaries, including “Bridgestone/Firestone, Inc.” The
record also reflects that information on Bridgestone’s website, such as representations
that Bridgestone’s eight proving grounds included those in Texas, blurred the distinction
between Bridgestone and Firestone. 
          After reviewing all of the evidence, we hold that the evidence is legally and factually
sufficient to establish that Bridgestone and Firestone were operated as a single business
enterprise. 
Fair Play and Substantial Justice
          We next determine whether the trial court’s exercise of jurisdiction over Bridgestone
comports with traditional notions of fair play and substantial justice. See Guardian Royal
Exch. Assurance Ltd. v. English China Clays, P.L.C., 815 S.W.2d 223, 228 (Tex. 1991);
EMI, 97 S.W.3d at 859. While conducting this inquiry, we bear in mind that only in rare
cases will the exercise of jurisdiction not comport with fair play and substantial justice when
the nonresident defendant has purposefully established minimum contacts with the state. 
Guardian Royal, 815 S.W.2d at 231; EMI, 97 S.W.3d at 859-60. The nonresident
defendant must present a “compelling” case that the exercise of jurisdiction would be
unreasonable. Guardian Royal, 815 S.W.2d at 231. Bridgestone’s contacts with Texas
must be evaluated in light of several factors, which are: (1) the nonresident’s burden; (2)
the forum state’s interest in adjudicating the dispute; and (3) the plaintiff’s interest in
obtaining convenient and effective relief. EMI, 97 S.W.3d at 860.


 When an international
dispute is involved, the following factors should also be considered: (1) the unique burdens
placed upon the defendant who must defend itself in a foreign legal system; and (2) the
procedural and substantive policies of other nations whose interests are affected as well
as the foreign government’s interest in its foreign relation policies. See Guardian Royal,
815 S.W.2d at 229. 
           Bridgestone contends that the exercise of jurisdiction over it as a foreign
corporation, involving an accident that occurred in Mexico, does not comport with fair play
and substantial justice. We disagree. We have already determined that Bridgestone and
Firestone were operated as a single business enterprise. The record reflects that
Bridgestone “verifies technological advances” in tires at its proving grounds in Texas. 
Bridgestone has failed to present evidence establishing that the exercise of jurisdiction 
would be unreasonable. See id. at 231. After reviewing the factors, we hold that the
exercise of jurisdiction over Bridgestone by a Texas court does not offend traditional
notions of fair play and substantial justice. 
          We overrule appellant’s issue and affirm the trial court’s denial of Bridgestone’s
special appearance. 
              
                                                                                                                      
                                                               LINDA REYNA YAÑEZ
                                                                           Justice



Opinion delivered and filed this the
1st day of April, 2004.