NUMBER 13-02-385-CV



COURT OF APPEALS



THIRTEENTH DISTRICT OF TEXAS



CORPUS CHRISTI - EDINBURG


 


FORMOSA PLASTICS CORPORATION, USA, Appellant,


v.
 


KAJIMA INTERNATIONAL, INC., Appellee.

 


On appeal from the 135th District Court of Calhoun County, Texas.


 


OPINION ON REHEARING EN BANC



Before the Court En Banc 


Opinion on Rehearing En Banc



 Appellee, Kajima International, Inc. ("Kajima"), moved for rehearing en banc of this
Court's opinion issued November 10, 2004, in which the Court concluded that Formosa
Plastics Corp., USA ("Formosa") met its burden to disqualify A.W. "Chip" Hutchison,
Kajima's expert witness, on the basis that Hutchison's colleague, Steven Huyghe,
previously consulted with Formosa. Formosa Plastics Corp., USA v. Kajima Int'l, Inc., No.
13-02-00385-CV , 2004 Tex. App. LEXIS 9950, *15 (Tex. App.-Corpus Christi Nov. 10,
2004, no pet. h.). The Court reversed the judgment and remanded the matter for a new
trial with directions that Hutchison and others from his firm would not be permitted to testify. 
See id. at *20. Justice Castillo's dissenting opinion concluded that Formosa had waived
the side-switching issue, and would have affirmed the judgment of the trial court. Id. at *83
(Castillo, J., dissenting).

 The Court has granted rehearing en banc. We withdraw our original opinion and
judgment issued on November 10, 2004, and issue this opinion and accompanying
judgment in their stead. On rehearing, we conclude that Formosa failed to meet its burden
of proof to disqualify Hutchison, and we affirm the judgment of the trial court. 

I. Background 


 Kajima International Inc. ("Kajima"), an industrial construction company, submitted
several bids for work on Formosa's expansion plant project located in Point Comfort,
Texas. Formosa awarded Kajima five contracts, some involving piping work in the olefins
area and others involving piping and equipment setting work in the polypropylene plant. 
Each contract specified a schedule of performance. The general terms and conditions
common to all contracts permitted Kajima to work overtime only if Kajima or its
subcontractors delayed the work, and, in such an event, Kajima received no additional
compensation for the overtime. 

 Performance took much longer than provided for in the contracts, causing Kajima's
costs to vastly exceed the contract amount paid by Formosa. Kajima asserts it was
required to spend this money as a result of Formosa's fraudulent conduct in connection
with the bidding process and its fraudulent inducement of extra-contractual work. 
According to Kajima, the engineering drawings for its work at the polypropylene plant were
full of errors and inaccuracies, yet Formosa knowingly misrepresented the quality of the
design drawings for the project during the bidding process. Kajima asserts Formosa
fraudulently induced it to enter into the contracts and make artificially low bids on the
contracts by withholding information relating to the design and drawings of the
polypropylene plant. Kajima further asserts Formosa knowingly provided Kajima with a
false schedule concerning the olefins plant which failed to reveal that multiple contractors
would be working in the same location, and at the same time, as that planned by Kajima,
thus preventing Kajima from executing its responsibilities under the contracts. Moreover,
according to Kajima, Formosa engaged in a "string along" fraud scheme in which Formosa
made repeated false promises to compensate Kajima for delays, disruptions, bid
omissions, and additional costs in order to keep Kajima working. At the conclusion of the
project, Kajima had spent in excess of $38 million but had received only $10 million from
Formosa. 

 Formosa counters that Kajima spent in excess of the contract prices because of
Kajima's own bidding and contract administration mistakes. Formosa asserts the drawings
were adequate for building and bidding and, when problems arose, Kajima was paid
pursuant to the contract. Formosa further contends that Kajima knew other contractors
would be working within its area and that any conflict in scheduling was the result of
Kajima's own mismanagement.

 Kajima sued Formosa and Formosa Plastics Corp., Texas ("Formosa Texas") in
January 1993 for breach of contract, fraud, and quantum meruit arising from five of the
construction contracts. The matter was first tried to a jury in 1997. The jury found that
Formosa did not breach any of the five contracts but did fraudulently induce one of the
contracts. The trial court subsequently rendered judgment for Kajima for $4,491,066.65. 
Kajima appealed, and this Court reversed and remanded the case for a new trial. Kajima
Int'l Inc. v. Formosa Plastics Corp., USA, 15 S.W.3d 289, 294 (Tex. App.-Corpus Christi
2000, pet. denied). 

 The case was tried again in 2002. Kajima nonsuited Formosa Texas and the matter
was submitted to the jury on the issue of fraud. The jury found Formosa guilty of fraud and
awarded Kajima approximately $15 million dollars, or roughly 60% of the damages it
sought. The trial court rendered judgment for Kajima for actual damages of
$15,432,123.45, prejudgment interest of $14,210,269.65, and $403,156.86 in costs. This
appeal ensued. Formosa raises nine issues on appeal. 

II. Expert Disqualification


 We will first address Formosa's third issue on appeal, that is, the expert
disqualification issue which the Court found determinative of the appeal in its original
opinion. Formosa alleges that Kajima's expert, A. W. "Chip" Hutchison, should not have
been permitted to testify. Formosa first argues that an expert retained and paid by one
party cannot switch sides and testify as an expert for the opposing party in the same case. 
Formosa contends that the firm of A. W. Hutchison & Associates, Inc. served as Formosa's
"consulting" experts and Formosa satisfied all requirements to disqualify the firm and Chip
Hutchison. In contrast, Kajima contends that any information Formosa provided to
Hutchison's colleague, Steven Huyghe, was discoverable and not confidential, and no
confidential information was shared with Hutchison or Huyghe. Kajima further asserts that,
even if confidential information was disclosed to Huyghe, that knowledge could not be
imputed to Hutchison. The factual background regarding this matter is critical to
understanding and properly analyzing this issue. 

 When the question of litigation with Kajima first originated, Formosa retained the law
firm of Jones, Day, Reavis & Pogue ("Jones Day"). Counsel for Jones Day contacted
Huyghe, an expert in heavy industrial construction and president of A.W. Hutchison &
Associates of California, Inc. Huyghe and an assistant met with attorneys from Jones Day
and in-house counsel for Formosa. They spoke about "strategies for this case and what
kind of defense we ought to establish," and "what the contentions were that Kajima had
against Formosa and how we were going to answer some of those allegations." They
further discussed Kajima's allegations against Formosa and which allegations might be
true or were not true. Huyghe was to assist in document review and organization in order
to "see what we had." The Formosa attorneys never requested that Huyghe maintain
confidentiality regarding these conversations or documents, nor did they request that he
execute any confidentiality agreement. 

 Huyghe reviewed and organized documents that had been produced by Formosa
to Kajima and documents produced from Kajima to Formosa. He prepared a work plan
outlining his proposed method for evaluating the situation as well as an index of relevant
documents received from Kajima. 

 Huyghe sent several letters to Jones Day and copied some of those letters to
Hutchison, his colleague at A. W. Hutchison & Associates, Inc., in Atlanta, a separate but 
related corporation from that which employed Huyghe. (1)

 The first of these letters, dated June 14, 1993, discussed the consulting group's
"possible involvement" in the litigation, provided examples of prior work, and mentioned
that Hutchison was available for a meeting "if you so desire." A letter dated October 19,
1993, discussed what A.W. Hutchison & Associates had done for clients in the past and
explained the methodology usually employed to evaluate problems. This letter was
marked as "privileged and confidential." Huyghe also provided a letter agreement for the
engagement of the group and included a proposed confidentiality agreement, which
Formosa's attorneys never signed. 

 In late 1993, Formosa transferred its defense from Jones Day to the law firm of
Porter & Hedges. The Porter & Hedges attorneys received Huyghe's proposed work plan
and the index of documents from Kajima, but decided not to employ Huyghe's services. 
On April 6, 1994, Porter & Hedges told Huyghe to consider himself "indefinitely on hold." 
By this point, Huyghe had submitted bills totaling approximately $22,000 for more than 167
hours of work. On April 15, 1994, Huyghe contacted Porter & Hedges and, detailing his
group's work on prior cases, requested an opportunity to meet with Formosa's attorneys
to present his thoughts on the case. Porter & Hedges failed to accept this invitation. 

 A few months later, Kajima's attorney approached Huyghe about consulting with
Kajima in the lawsuit. Huyghe informed the attorneys at Jones Day, who suggested
contacting Porter & Hedges about this possibility and any potential conflicts of interest. 
Apparently Huyghe did not contact the new attorneys. Huyghe did sign a "conflict
certification" affidavit provided by Kajima, in which he certified that "A.W. Hutchison &
Associates, Inc., has not received any confidential information from any Formosa entity or
from its counsel." Kajima did not hire Huyghe; however, it did hire both Chip Hutchison
and Brian Rogers of A.W. Hutchison & Associates, Inc. in Atlanta, Georgia. 

 At the trial, Huyghe testified that he had not received any confidential information
from Formosa. In contrast, an attorney for Jones Day testified that she had revealed
confidential information, including settlement strategies, to Huyghe. Nevertheless, Jones
Day admitted that it had not made a determination regarding whether Huyghe would be
utilized as a testifying expert. 

 Huyghe testified that he had never discussed any Formosa-related information with
Hutchison or Rogers. Counsel for Jones Day testified that the lawyers at the firm had no
communications with Hutchinson or Rogers, did not disclose any information to Hutchinson
or Rogers, and knew of no confidential information that was ever disclosed from Formosa
to Hutchinson or Rogers. Counsel also knew of no contact with Jones Day and Hutchinson
in Atlanta. Hutchison himself testified that he had no knowledge of any Formosa-related
information known to Huyghe. 

 On the basis of this lack of disclosure, the trial court denied Formosa's motion to
disqualify Hutchison and Rogers from testifying, and the jury subsequently awarded a
verdict in favor of Kajima.

 The chief issues before this Court are: (1) what guidelines should have framed the
trial court's decision whether to disqualify Hutchison and A. W. Hutchison and Associates
("AWH"); and (2) whether the trial court's decision was properly executed within those
guidelines. Any question about an expert's breach of his or her duties, fiduciary or
otherwise, to a former client is not at issue here. Likewise, the hypothetical question of 
whether Huyghe should have been disqualified is not before the Court, nor is the
hypothetical question of whether disqualification and other sanctions would have been
appropriate if Hutchison and Huyghe were lawyers and not engineering experts. 

 We write separately on this issue on rehearing en banc for the following reasons. 
The Court's dissenting opinion on rehearing adopts the two-part expert disqualification test
outlined in Koch Ref. Co. v. Jennifer L. Boudreaux MV, 85 F.3d 1178, 1181 (5th Cir. 1997). 
While we do not disagree with the dissent's utilization of this test, and, in fact, would apply
the same basic test with additional factors utilized by other courts, we diverge from the
dissent insofar as it concludes that Formosa met its burden for disqualification under this
standard. That is, the dissent states that it was objectively reasonable for Formosa to
believe that it had a confidential relationship with Hutchison and confidential information
was disclosed to Hutchison. We conclude otherwise. The concurring opinion on rehearing
asserts that Formosa waived its right to seek disqualification of Hutchison and AWH
because Formosa failed to assert a claim of confidentiality over information imparted to
Huyghe, and would affirm the judgment below. Rather than finding waiver, as does the
concurrence, we conclude simply that Formosa has failed to meet its initial burden to show
that disqualification is necessary. 

 Thus, we turn to the issue currently before the Court, that is, the disqualification of
a non-attorney expert witness based on another expert's work for the opposing party. We
will also examine the expert's contacts with the opposing party in the litigation. While the
issue of expert disqualification in terms of an expert's relationship with a law firm has been
tangentially discussed in opinions by the Texas Supreme Court and other appellate courts,
the issue at hand is one of first impression. See, e.g., In re Am. Home Prods. Corp., 985
S.W.2d 68, 73 (Tex. 1998) (orig. proceeding) (considering disqualification of counsel for
plaintiffs because of their retention of testifying expert who had previously worked as
consulting expert for defendant in the same litigation); In re Bell Helicopter, 87 S.W.3d 139,
151 (Tex. App.-Fort Worth 2002, orig. proceeding) (considering disqualification of law firm
because of its retention of consulting expert who had previously worked for defendant in
the same litigation). More specifically, the issues of first impression we must address are: 
(1) whether an expert should be disqualified where he was retained by one side but was
somehow related to an expert previously retained by the opposing party; and (2) whether
the entire firm of experts to which both of these experts belong should be disqualified.

 We first must decide the appropriate standard of review. In general, we review the
trial court's decision to admit or exclude expert evidence for an abuse of discretion. State
Farm Fire & Cas. Co. v. Rodriguez, 88 S.W.3d 313, 318 (Tex. App.-San Antonio 2002,
pet. denied); see Guadalupe-Blanco River Auth. v. Kraft, 77 S.W.3d 805, 810 (Tex. 2002).

We see no reason not to apply this standard herein even though this matter turns not on
qualifications or reliability, but rather on an alleged conflict of interest. We reverse based
on the erroneous admission or exclusion of evidence only if the appellant shows error that
was calculated to cause and probably did cause the rendition of an improper judgment. 
Tex. R. App. P. 44.1(a); City of Brownsville v. Alvarado, 897 S.W.2d 750, 753 (Tex. 1995);
Doncaster v. Hernaiz, 161 S.W.3d 594, 601 (Tex. App.-San Antonio 2005, no pet.) ("error
on questions of evidence is generally not reversible unless the appellant can show that the
whole case turns on the particular evidence admitted or excluded"). We note that
disqualification is a drastic measure that courts should impose only "hesitantly, reluctantly,
and rarely." Owen v. Wangerin, 985 F.2d 312, 317 (7th Cir. 1993); Koch Ref. Co., 85 F.3d
at 1181; Hewlett-Packard Co. v. EMC Corp., 330 F. Supp. 2d 1087, 1092 (N.D.Cal. 2004);
United States v. Salamanca, 244 F. Supp. 2d 1023, 1025 (D.S.D. 2003); Proctor & Gamble
Co. v. Haugen, 184 F.R.D. 410, 413 (D. Utah 1999); Palmer v. Ozbek, 144 F.R.D. 66, 67
(D. Md. 1992). 

 When disqualification based on a prior relationship with an adversary is requested,
the majority of courts have adopted a two-prong test which balances the competing
interests of the parties. See W. Va. ex rel. Billups v. Clawges, 620 S.E.2d 162, 167, 218
W. Va. 22 (2005) (collecting cases); In re Mitchell, 981 P.2d 172, 175 (Colo. 1999). Under
the test, disqualification is warranted if: (1) the moving party possessed an objectively
reasonable basis to believe that a confidential relationship existed between that party and
the expert witness; and (2) confidential or privileged information was in fact provided to the
expert by the moving party. See Koch Ref. Co., 85 F.3d at 1181; Hewlett-Packard Co.,
330 F. Supp. 2d at 1093. (2) In the usual case, both factors must be present to merit
disqualification. See Hewlett-Packard, 330 F. Supp. 2d at 1093 (explaining that if only one
of the factors is present, disqualification is likely inappropriate). Other courts also apply
additional factors, sometimes generally spoken of in such general terms as "fundamental
fairness" and "prejudice." These courts consider and weigh competing policy
considerations, whether disqualification would be fair to the affected party or would be
unduly prejudicial, whether disqualification would promote the integrity of the judicial
process, and whether the public has an interest in allowing or not allowing the expert to
testify. See Grioli v. Delta Int'l Mach. Corp., 395 F. Supp. 2d 11, 13 (E.D.N.Y. 2005) (citing
cases); Hewlett-Packard Co., 330 F. Supp. 2d at 1094-95 (citing cases). As stated in
Hewlett-Packard:

 It is important to consider other policy concerns in order to achieve the goal
of protecting the integrity of the adversary process and of promoting public
confidence in the legal system. Such concerns include consideration of the
parties' strategic positions . . . and avoidance of creating 'troublesome
incentives for both experts and the retaining party.' For example, if experts
are permitted to breach confidentiality agreements, they might be motivated
'to sell their opinions to the opposing parties or the highest bidder without
concern about the potential confidentiality of their previous consultations."
The retaining party might be motivated 'not to withdraw a previously
designated expert while litigation is pending for fear that the party's
confidential information would become available to its adversary.' However,
if 'experts are too easily disqualified, unscrupulous attorneys may attempt to
create relationships with numerous potential experts at a nominal fee hoping
to preempt the ability of their adversaries to obtain expert assistance.' 


Hewlett-Packard Co., 330 F. Supp. 2d at 1095 (internal citations omitted).

 Under this test, the moving party bears the burden of demonstrating that
disqualification is necessary. Grioli, 395 F. Supp. 2d at 14; Hewlett-Packard Co., 330 F.
Supp. 2d at 1096. The party seeking disqualification bears the burden of establishing both
the existence of confidentiality and its nonwaiver. United States ex rel. Cherry Hill
Convalescent Ctr., Inc. v. Healthcare Rehab Sys., Inc., 994 F. Supp. 244, 249 (D.N.J.
1997); Cordy v. Sherwin-Williams Co., 156 F.R.D. 575, 580 (D.N.J. 1994).

 In evaluating the first prong of the test, that is, whether there was an objectively
reasonable basis to believe that a confidential relationship existed with the expert, courts
have considered various factors, including:

 (1) whether the relationship was one of long standing and involved frequent
contacts instead of a single interaction with the expert;


 (2) whether the parties entered into a formal confidentiality agreement;


 (3) whether the expert was asked to agree not to discuss the case with the
opposing parties or counsel;


 (4) whether the expert derived any of his specific ideas from work done under
the direction of the retaining party;


 (5) the number of meetings between the expert and the attorneys;


 (6) whether the party retained the expert to assist in litigation;


 (7) whether the expert was paid a fee;


 (8) whether work product was discussed or documents were provided to the
expert;


 (9) whether alleged confidential communications were from expert to party or
vice versa; 


 (10) whether the moving party funded or directed the formation of the opinion to
be offered at trial; and


 (11) the extent to which the expert learned of the party's litigation strategies. 


Lacroix v. Bic Corp., 339 F. Supp. 2d 196, 200 (D. Mass. 2004); Hewlett-Packard, 330 F.
Supp. 2d at 1093; Stencel v. Fairchild Corp., 174 F. Supp. 2d 1080, 1083 (D.Ca. 2001);
Mayer v. Dell, 139 F.R.D. 1, 3 (D.D.C. 1991); Paul v. Rawlings Sporting Goods Co., 123
F.R.D. 271, 280 (S.D. Ohio 1988). A long-term relationship is more likely to exist when the
"record supports a longstanding series of interactions, which have . . . coalesced to create
a basic understanding of the retaining party's modus operandi, patterns of operation, and
decision-making process." Hewlett-Packard, 330 F. Supp. 2d at 1093 (quoting Marvin
Lumber & Cedar Co. v. Norton Co., 113 F.R.D. 588, 591 (D. Minn. 1986)). Conversely,
informal consultations occur when the expert received no insight into the present litigation
strategy. Id. In examining this prong of the test, the emphasis is not on whether the expert
was retained per se, but whether there was a relationship that would permit the litigant to
reasonably expect that any communications would remain confidential. Id.; Lacroix, 339
F. Supp. 2d at 200 (D. Mass. 2004).

 Confidential information is information "of either particular significance or [that] which
can be readily identified as either attorney work product or within the scope of
attorney-client privilege." Hewlett-Packard, 330 F. Supp. 2d at 1093 (citations omitted). 
It could include discussion of the party's strategy in the litigation, the kinds of experts the
party expects to retain, the party's view of the strengths and weaknesses of each side, the
role of each of the experts to be hired, and anticipated defenses. Id. at 1094; Lacroix, 339
F. Supp. 2d at 201. Communication based upon technical information, as opposed to legal
advice, is not considered privileged, Nikkal Indus., Ltd. v. Salton, Inc., 689 F. Supp. 187,
191-92 (S.D.N.Y. 1988), nor is information that is routinely discoverable. In re Mitchell, 981
P.2d at 176; Palmer v. Ozbek, 144 F.R.D. 66, 68 (D. Md. 1992). Unlike attorney-client
communications, discussions between parties or counsel and experts do not carry the
presumption that confidential information was exchanged. Hewlett-Packard, 330 F. Supp.
2d at 1094; Nikkal Indus., Ltd., 689 F. Supp. at 191-92. Because the burden is on the
party seeking disqualification, that party should point to specific and unambiguous
disclosures that, if revealed, would prejudice the party. Hewlett-Packard, 330 F. Supp. 2d
at 1094. 

 In urging this Court to disqualify Hutchison and AWH, Formosa cites authority
regarding the disqualification of legal personnel and law firms and suggests that Hutchison
and AWH should be disqualified in this case under the same rules that prevent an attorney
from representing an adversary against a former client. While the rationale for
disqualifying an expert is similar to that for disqualifying an attorney who has a conflict of
interest, the two situations are distinguishable and subject to different standards. See
Grioli, 395 F. Supp. 2d at 13; In re Ambassador Group, Inc., Litigation, 879 F. Supp. 237,
241 (E.D.N.Y. 1994). Unlike attorneys, expert witnesses generally serve as sources of
information and not necessarily as recipients of confidences. See, e.g., English Feedlot
v. Norden, 833 F. Supp. 1498, 1501 (D. Colo. 1993) ("The expert disqualification standard
must be distinguished from the attorney-client relationship because experts perform very
different functions in litigation than attorneys."); Paul, 123 F.R.D. at 281 (stating that
attorneys occupy "a position of higher trust, with concomitant fiduciary duties, to a client
than does an expert consultant"). The majority of courts that have considered the issue
of expert disqualification have applied different standards from those used when reviewing
the disqualification of an attorney. This approach is well-reasoned and we adopt it. 
Accordingly, the Court will not apply the stringent attorney-client conflict standards in
determining whether Kajima's expert in this case should be disqualified. 

 Applying the foregoing principles to the instant case, it seems clear that Huyghe
would be disqualified from representing Kajima, if indeed that were the issue currently
before us. It was objectively reasonable for Formosa to conclude that a confidential
relationship existed between Huyghe and Formosa, and the evidence before the trial court
would have supported the conclusion that confidential or privileged information was
disclosed to Huyghe. (3)
 This would be a clear-cut case of side-switching that would
immediately merit disqualification. See Koch, 85 F.3d at 1181.

 However, the issue currently before the Court is not the disqualification of Huyghe,
but whether the trial court abused its discretion in refusing to disqualify Hutchison. We
hold that Formosa failed to meet its burden to meet either prong of the Koch test: (1) that
it was objectively reasonable for Formosa to conclude that it had a confidential relationship
with Hutchison; or (2) confidential or privileged information was in fact provided to
Hutchison by either Formosa, as the moving party, or Huyghe, his colleague at AWH.

 Based on our review of the record evidence, it was not objectively reasonable for
Formosa to conclude that it had a confidential relationship with Hutchison. Formosa did
not have a prior relationship with Hutchison and never met, corresponded, or spoke with
him about this litigation. Although Huyghe told Formosa that Hutchison was available to
work on the Kajima case, Hutchison did not perform any work for Formosa on this matter,
in coordination with Huyghe or otherwise. Accordingly, disqualification is not warranted. 
See Hewlett-Packard, 330 F. Supp. at 1093. 

 Insofar as Formosa's motion to disqualify sought the disqualification of the entire
consulting group of AWH, we have previously determined that the disqualification rules
applicable to attorneys, which would allow for disqualification of a firm based on imputed
knowledge, should be inapplicable to expert witnesses. See Stencel, 174 F. Supp.2d at
1083; United States ex rel Cherry Hill Convalescent Ctr., Inc., 994 F. Supp. at 249. 
Accordingly, we do not find that Formosa had a confidential relationship with AWH, or that
Formosa had a confidential relationship with Hutchison merely by virtue of Hutchison's
association with Huyghe or Huyghe's consulting group.

 Moreover, even if we were to conclude that it was objectively reasonable for
Formosa to believe that it had a confidential relationship with Hutchison, there remains no
showing regarding the second prong of the Koch test, that is, that any confidential or
privileged information was disclosed to Hutchison by either Jones Day or Huyghe. 
Saliently, none of the trial witnesses testified that they disclosed confidential information
to Hutchison. We have closely examined the written communications that Huyghe sent to
Formosa and copied to Hutchison, and we see no signs therein of privileged or confidential
information. These communications consisted primarily of marketing efforts, budget
estimates, and proposals for work. In fact, at the stage of the litigation when those letters
were sent, Huyghe's work on the case was clearly in its infancy and additional work
remained to be done. 

 We conclude that Formosa failed to meet its burden under the two-prong test for
disqualification articulated by the Fifth Circuit in Koch. See Koch Ref. Co., 85 F.3d at
1178. However, in considering the issue of disqualification, we also consider additional
factors, including the competing policy considerations, applicable to the requested
disqualification. Based on the record before the Court, the trial court's decision not to
disqualify Hutchison and AWH was neither prejudicial nor fundamentally unfair to either of
the parties. The policies of allowing experts to pursue their trade, allowing parties to select
their own experts, and preventing gamesmanship, whereby parties create conflicts solely
for the purposes of preventing their adversary from using the services of the expert,
outweigh the policy of preventing conflicts under the particular factual circumstances
present in the instant case. Formosa has not clearly identified any prejudice it has suffered
from Kajima's retention of Hutchison or AWH. In contrast, Kajima clearly would suffer
hardship if Hutchison were now disqualified at this stage of the litigation. In considering
concepts of fundamental fairness and prejudice, prejudice is particularly likely at a late
stage in the litigation, at which time disqualification is more likely to disrupt the judicial
proceedings. Hewlett-Packard, 330 F. Supp. 2d at 1095. In the instant case, the matter
has now twice been to trial, and accordingly, Kajima would be prejudiced by Hutchison's
disqualification. 

 Formosa bore the burden of proof with respect to the disqualification of Hutchison
and AWH, and we conclude that it failed to sustain that burden. Koch Ref. Co., 85 F.3d
at 1181; Hewlett-Packard, 330 F. Supp. 2d at 1095-96. Because of this conclusion, we
need not address the issue of waiver as discussed by the concurrence. Accordingly, we
overrule Formosa's third issue insofar as it relates to disqualification.

 In a subissue, Formosa contends that the trial court abused its discretion by failing
to exclude Hutchison's testimony regarding damages because the testimony was not
reliable. According to Formosa, Hutchison's damage testimony was based on his own
"Hutchison Method," (4)
 also known as the "as-released method," which has no support in law
or within the construction industry. Kajima contends, in response, that Hutchison's
opinions were both relevant and reliable.

 An expert witness may testify regarding scientific, technical, or other specialized
subjects if the expert is qualified and if the expert's opinion is relevant and based on a
reliable foundation. Tex. R. Evid. 702; Helena Chem. Co. v. Wilkins, 47 S.W.3d 486, 499
(Tex. 2001); E.I. du Pont de Nemours & Co. v. Robinson, 923 S.W.2d 549, 556 (Tex.
1995). In determining whether expert testimony is reliable, a court should examine "the
principles, research, and methodology underlying an expert's conclusions." Mack Trucks
v. Tamez, 50 Tex. Sup. Ct. J. 80, 2006 Tex. LEXIS 1074, *9-*11 (Tex. Oct. 27, 2006)
(quoting Exxon Pipeline Co. v. Zwahr, 88 S.W.3d 623, 629 (Tex. 2002)). When the
testimony involves scientific knowledge, the expert's conclusions must be based on the
methods and procedures of science, or the testimony is "no more than 'subjective belief
or unsupported speculation.'" Robinson, 923 S.W.2d at 557 (quoting Daubert v. Merrell
Dow Pharms., Inc., 509 U.S. 579, 590 (1993)). We apply certain non-exclusive factors to
examine the reliability of expert testimony based on scientific knowledge, but these factors
may not apply when testimony involves technical or other specialized knowledge. Mack
Trucks, 2006 Tex. LEXIS 1074, at *9-*11; see Gammill v. Jack Williams Chevrolet, 972
S.W.2d 713, 726 (Tex. 1998) (listing factors). The Supreme Court in Kumho Tire Co. v.
Carmichael suggested that the Daubert standard is a flexible one, and that the trial court
should "make certain that an expert, whether basing testimony upon professional studies
or personal experience, employs in the courtroom the same level of intellectual rigor that
characterizes the practice of an expert in the relevant field." Kumho Tire Co. v.
Carmichael, 526 U.S. 137, 152 (1999). When the expert testimony is based on technical
or other specialized knowledge, there must be some basis for the opinion to show its
reliability. Gammill, 972 S.W.2d at 726. And, there cannot be too great an "analytical gap"
between the data and the expert opinion offered. Id. 

 Formosa does not challenge Hutchison's qualifications or the relevance of his
opinions, but instead focuses solely on the reliability of Hutchison's expert testimony
insofar as it allegedly was based on the "as-released" method to quantify damages. Based
on our review of the instant trial record, we conclude that Hutchison's testimony did not
include the criticized "as-released method" for calculating damages. The "as-released"
method relates to delay causation, and Hutchison's opinion testimony was not based on
the causation of delays, but rather, was limited to valuation of the work performed by
Kajima. Hutchison's testimony regarding the calculation of the reasonable value of the
work performed by Kajima was objectively verifiable and was based on unit pricing and
quantities and utilized standard estimating techniques. Formosa does not offer any
criticism relevant to this testimony. Accordingly, we conclude that Formosa's attack on the
reliability of Hutchison's testimony was misplaced, and Formosa's subissue on this subject
is overruled. We overrule Formosa's third issue. 

 III. Fraud Damages


 In its first issue, Formosa argues that the evidence is legally and factually insufficient
to support the jury's award of fraud damages. According to Formosa, a rational basis must
exist for a damages finding.

 The trial court's charge asked the jury to determine Kajima's fraud damages and
instructed the jury to consider "[t]he difference, if any, between the reasonable value
(excluding any profit) of Kajima's work it performed for Formosa and what Kajima was
paid." The jury awarded Kajima $15,432,123.45. 

 Juries have broad discretion in assessing damages where the law provides no
precise legal measure; a jury's findings will not be disregarded merely because its
reasoning in arriving at its figures may be unclear, so long as a rational basis for its
calculation exists. McMillin v. State Farm Lloyds, 180 S.W.3d 183, 201 (Tex. App.-Austin
2005, no pet.); Swank v. Sverdlin, 121 S.W.3d 785, 799 (Tex. App.-Houston [1st Dist.]
2003, pet. denied); First State Bank v. Keilman, 851 S.W.2d 914, 930 (Tex. App.-Austin
1993, writ denied).

 Formosa argues that the record is devoid of any evidence supporting the jury's
award of $15,432,123.45 and that the numerical sequencing of the finding shows that the
award was randomly chosen and not based on the evidence before the jury. Formosa
argues that this case is identical to that considered by the Austin Court of Appeals in First
State Bank v. Keilman, 851 S.W.2d 914 (Tex. App.-Austin 1993, writ denied). In Keilman,
the plaintiffs brought a usury claim against First State Bank, arguing that they were
charged $7,161.44 in unauthorized interest. See id. at 931. The bank submitted evidence
that it did not charge unauthorized interest. Id. The jury heard evidence that damages
were either $7,161.44 or zero, yet awarded $360. Id. at 929. The Austin Court held that
no evidence supported this award, as it was "inexplicable in light of the evidence" and "it
appeared that the jury pulled a number out of a hat." Id. at 931.

 In the instant case, Kajima asked the jury to award it $25,307,287. In contrast,
Formosa argued that the jury should award Kajima nothing. However, this is not a
situation, as in Keilman, where there were only two possible answers to the damage
question. The evidence before the jury did not present a situation where damages could
be calculated based on only two possible choices. That is to say, "[r]ather than a binary
choice or a series of binary choices, this evidence presented the jury with a range of
possible awards." McMillan, 180 S.W.3d at 203. The fact that the jury chose neither the
figure requested by Kajima nor the figure suggested by Formosa does not invalidate the
award. 

 Formosa supports its argument as to the randomness of the award by pointing to
a question from the jury. During deliberations, the jury sent a note to the trial court asking:
"Judge, in question number two, are we to base our answer on the amount that is owed,
25.3 million, or how much they deserve." In response, the trial court referred the jury back
to the jury charge. Formosa contends that the jury inappropriately chose to award an
amount that it believed Kajima deserved rather than follow the instructions given to it. 
Again, we disagree. The question from the jury regarding how much Kajima deserved
equates to the reasonable value, excluding profit, of its work. 

 We conclude that the evidence here was sufficient to enable reasonable jurors to
choose from a range of possible damage awards that included the $15,432,123.45 amount
ultimately awarded. Kajima's expert, Hutchison, testified regarding the damages suffered
by Kajima. Hutchison first calculated the total costs incurred by Kajima to be $38,717,854. 
He then subtracted $3,330,574 from that figure, as costs that did not provide value to
Formosa, thus arriving at $35,387,380, as representing the reasonable value of the work
performed by Kajima. Hutchison then subtracted $10,000,000 as the amount paid by
Formosa. Kajima argued that the resulting figure, $25,387,380, represented the difference
in value between what was given by Kajima and what was paid by Formosa. 

 In contrast, Formosa argued that Kajima's figure should be reduced because of
wasted labor that did not add value for Formosa. Mike Holloway, a Formosa field
supervisor, specifically testified that half of all labor spent by Kajima was wasted. Other
testimony attacked Kajima's productivity and work methodology. 

 In the case before us, the testimony of the witnesses and experts was lengthy and
detailed. The evidence regarding damages contained many components to be considered
and disparate estimates of values to be assigned to each. See Aboud v. Schlichtemeier,
6 S.W.3d 742, 749 (Tex. App.-Corpus Christi 1999, pet. denied). The damages awarded
by the jury were well within the range of evidence. This evidence supplied a basis for the
jury to rationally ascertain the value of work performed by Kajima and what Kajima was
paid. We hold that there is legally and factually sufficient evidence to support the jury's
finding in regard to actual damages. We overrule Formosa's first issue.

IV. Charge Error


 In its second issue, Formosa contends that the trial court's submission of a single
broad-form liability question is reversible error. In this case, the jury was asked, "Did
Formosa commit fraud against Kajima?" Formosa argues that the charge should have
provided separate answer blanks for each of the five contracts at issue in this case. 
Formosa contends that the failure to include separate answer blanks for each contract
makes it impossible to trace the jury's damage award back to any specific contract or
contracts and prevents Formosa from challenging the sufficiency of the evidence as to any
of the individual contracts. 

 We are required to order a new trial under Crown Life Insurance Co. v. Casteel
when "a single broad-form liability question incorporates multiple theories of liability" in
such a way that we "cannot determine whether the jury based its verdict on an improperly
submitted invalid theory." See Crown Life Ins. Co. v. Casteel, 22 S.W.3d 378, 388 (Tex.
2000).

 We disagree with Formosa's argument. Casteel applies to multiple theories of
liability; by contrast, the instant situation involves only one-fraud. Contrary to Formosa's
contention, Casteel does not require a granulated submission as to multiple acts under a
single theory of liability. (5) See id. Moreover, I would note that the error of including a
factually unsupported claim in a broad-form jury question is not always reversible. Romero
v. KPH Consol., Inc., 166 S.W.3d 212, 227 (Tex. 2005). To be reversible, the erroneous
instruction must have "probably prevented the appellant from properly presenting the case
to the court of appeals." See Tex. R. App. P. 44.1(a)(2); Romero, 166 S.W.3d at 227. 
Here, the underlying conduct upon which the jury found liability was essentially the same
for all five of the contracts at issue. On this record, we are "reasonably certain that the jury
was not significantly influenced by issues erroneously submitted to it." See Romero, 166
S.W.3d at 227-28. Consequently, even if Casteel applied in the instant analysis, we would
have found that any error in the jury instruction was harmless. We overrule Formosa's
second issue.

V. Ratification


 In its fourth issue, Formosa argues that the trial court erred by refusing to submit its
requested issue on ratification to the jury. According to Formosa, it pleaded and properly
requested a jury submission on ratification and there was ample evidence to support an
issue on ratification. Ratification is a plea in avoidance and thus an affirmative defense
which, absent trial by consent, is waived unless affirmatively pleaded. Land Title Co. v. F.
M. Stigler, Inc., 609 S.W.2d 754, 756 (Tex. 1980).

 A person ratifies an unauthorized act if, by word or conduct, with knowledge of all
material facts, he confirms or recognizes the act as valid. Miller v. Kennedy & Minshew,
142 S.W.3d 325, 342-43 (Tex. App.-Fort Worth 2003, pet. denied); Mo. Pac. R.R. Co. v.
Lely Dev. Corp., 86 S.W.3d 787, 792 (Tex. App.-Austin 2002, pet. dism'd). Ratification
need not be shown by express word or deed but may be inferred by a course of conduct.
Miller, 142 S.W.3d at 342-43; Mo. Pac. R.R. Co., 86 S.W.3d at 792. 

 In Fortune Production Co. v. Conoco, Inc., 52 S.W.3d 671 (Tex. 2000), the Texas
Supreme Court held that a party who does not have a continuing obligation to perform
under a contract, but nevertheless continues to perform after learning of a fraud, ratifies
the fraud and therefore cannot recover damages for the period of time when the party
knew of the fraud. Id. at 680; see Meyer v. Cathey, 167 S.W.3d 327, 331 (Tex. 2005). A
party may ratify an agreement induced by fraud in such a way that both the right to rescind
and a claim for damages are foreclosed, although ratification can also be in such a way
that loss of the right to rescind the contract occurs without loss of the right to sue for
damages. See Fortune Prod. Co., 52 S.W.3d at 677-78; Harris v. Archer, 134 S.W.3d 411,
428 (Tex. App.-Amarillo 2004, pet. denied). 

 It is well established that litigants have a right to a fair trial before a jury that is
properly instructed on the issues authorized and supported by the law governing the case. 
Harris County v. Smith, 96 S.W.3d 230, 234 (Tex. 2002). "If an issue is properly pleaded
and is supported by some evidence, a litigant is entitled to have controlling questions
submitted to the jury." Triplex Comm. v. Riley, 900 S.W.2d 716, 718 (Tex. 1995); see Tex.
R. Civ. P. 278; see also Elbaor v. Smith, 845 S.W.2d 240, 243 (Tex. 1992). 

 The trial court has broad discretion in submitting jury questions and instructions.
Plainsman Trading Co. v. Crews, 898 S.W.2d 786, 791 (Tex. 1995). "Failure to submit a
question shall not be deemed a ground for reversal of the judgment unless a substantially
correct question has been requested in writing and tendered by the party complaining of
the judgment." Tex. R. Civ. P. 278. When a trial court refuses to submit a proper question
or instruction, reversal is not required unless the error probably caused the rendition of an
improper judgment. See Tex. R. App. P. 44.1; Union Pac. R.R. Co. v. Williams, 85 S.W.3d
162, 170 (Tex. 2002).

 Formosa argues that evidence supporting the submission of ratification includes a
meeting in March of 1992, at which Kajima's management realized it would lose $25 million
unless it walked off the job. Formosa unilaterally characterizes this evidence as proof that,
"[b]y recognizing its right to cancel the contracts, Kajima acknowledged the alleged fraud. 
Nevertheless, Kajima chose to go forward under the contracts, even though it knew that
it would cost $25 million to complete the contracts. This is ratification." Yet Formosa offers
neither any proof nor any argument which would explain how the evidence of Kajima's
March 1992 meeting would possibly qualify as ratification in light of Kajima's evidence of
Formosa's contemporaneous and even subsequent promises of compensation for delays,
disruptions, and bid omissions offered to induce Kajima to remain on the job. In the same
vein, Formosa also argues that Kajima knew of alleged misrepresentations regarding the
CTCI drawings, yet continued to perform under the CM903 contract. Formosa also argues
that Kajima knew of fraud regarding the LM905 and LM910 contracts, that is, that Kajima
knew that other contractors were behind schedule and were congesting Kajima's work
area, both before signing the contracts and before beginning construction. 

 We reject Formosa's view of the evidence and the law of ratification. Formosa has
not presented evidence that Kajima acted with "full knowledge of the fraud and of all
material facts." Fortune Prod. Co., 52 S.W.3d at 677. Nor has Formosa adduced
evidence that Kajima showed "the intention, clearly manifested, of abiding by the
affirmance of the contract" or evidence of acts that indicated Kajima's intention to waive
the fraud. See id. Accordingly, we overrule Formosa's fourth issue.

VI. Exclusion of Evidence


 In its fifth issue, Formosa contends that the trial court committed reversible error
when it prevented Formosa from submitting evidence that Kajima's damages were not
caused by fraud. Formosa argues that the trial court excluded evidence that Kajima
omitted "millions of dollars worth of items from its bids" and also excluded other testimony
showing that Kajima's damages were self-inflicted and were not proximately caused by any
alleged fraud on Formosa's part. 

 Whether to admit or exclude evidence is a matter committed to the trial court's
sound discretion. See City of Brownsville, 897 S.W.2d at 753; Bic Pen Corp. v. Carter, 171
S.W.3d 657, 676 (Tex. App.-Corpus Christi 2005, pet. granted). To reverse a judgment
based on a claimed error in admitting or excluding evidence, a party must show that the
error probably resulted in an improper judgment. Tex. R. App. P. 44.1(a); Alvarado, 897
S.W.2d at 753. In determining if the excluded evidence probably resulted in the rendition
of an improper judgment, we review the entire record. Interstate Northborough P'ship v.
State, 66 S.W.3d 213, 220 (Tex. 2001). A successful challenge to evidentiary rulings
usually requires the complaining party to show that the judgment turns on the particular
evidence excluded or admitted. Id. We will not reverse a judgment because a trial court
erroneously excluded evidence when the evidence in question is cumulative and not
controlling on a material issue dispositive to the case. Id.

 We conclude that the excluded evidence was both irrelevant and cumulative of other
evidence adduced at trial. Evidence regarding items omitted from Kajima's bid is irrelevant
in a fraud case involving an out-of-pocket measure for damages. See Formosa Plastics
Corp., USA v. Presidio Eng'rs. & Contractors, 960 S.W.2d 41, 49 (Tex. 1998). Moreover,
the excluded evidence was cumulative insofar as several witnesses testified regarding
Kajima's bids and the omissions from the bids. Other excluded evidence, such as the
alleged mismanagement, bribery, and theft by one of Kajima's managers, was also
irrelevant to the ultimate issue regarding whether or not Formosa committed fraud. 

 Formosa's entire defense of the case centered on Kajima's alleged mismanagement
of the project causing self-inflicted loss. In the context of Formosa's entire defense, we
cannot agree that exclusion of the evidence caused an improper verdict. Accordingly, we
overrule Formosa's fifth issue. 

VII. Out of Pocket Losses


 In its sixth issue, Formosa alleges that Kajima's out-of-pocket loss could not have
exceeded half of what the jury awarded, and the trial court erroneously refused to admit
evidence of Kajima's self-inflicted losses and to instruct the jury on mitigation. 

 There are two measures of damages for fraud. They are the benefit-of-the-bargain
measure and the out-of-pocket measure. See id. Benefit-of-the-bargain damages are the
difference between the value as represented and the value received. Id. Out-of-pocket
damages compensate a defrauded party for the difference between the value of that with
which he or she has parted and the value actually received. Id. 

 The damages question at issue asked the jury to determine Kajima's out-of-pocket
measure of damages-one of the two recognized damage models for fraud. See id. 
Formosa contends that under this measure the relevant figures, the value paid and the
value received, were established at the time the contracts were signed. See Arthur
Anderson v. Perry Equip. Corp., 945 S.W.2d 812, 817 (Tex. 1997). Formosa contends that
Hutchison testified that the value of Kajima's work "under normal conditions," that is, the
value of what Kajima contracted to provide when the relevant contracts were signed, was
approximately $17 million dollars. The value that Formosa agreed to pay Kajima was $10
million dollars. Formosa thus argues that the evidence establishes that, at most, Kajima's
out-of pocket loss was the difference between these two values, a figure somewhere
between $7 million and $8 million.

 We disagree with the basis for Formosa's contention. As an initial matter, the Arthur
Anderson construct, which measures damages at the time the contract is signed, applies
to a purchase and sale of a business. See id. As such, it is inapplicable to a construction
contract. Even if it did apply, however, we would not apply it to a contract for services
wherein the evidence showed "string-along" fraud arising after execution of the contracts,
as the evidence in this case establishes. A damage analysis focusing solely on the date
that the contract was executed would omit damages attributable to post-contract fraud. 
See Kajima, 15 S.W.3d at 293-94.

 There is evidence to support the jury's award of approximately $15 million based on
the difference between the value of that with which Kajima parted and the value Kajima
actually received. See Formosa Plastics Corp. USA., 960 S.W.2d at 49. Hutchison
testified that the "as planned" cost of the job under normal conditions was roughly $17
million, but that the abnormal conditions concealed by Formosa resulted in an additional
$18 million being spent to complete the project. Accordingly, Kajima parted with
approximately $35 million and actually received only $10 million. The jury's award of
approximately $15 million was well under the $25 million difference between the value of
that with which Kajima parted and the value Kajima received.

 Formosa contends that the trial court erroneously refused to admit evidence of
Kajima's "self-inflicted" losses. We have already addressed this argument in connection
with Formosa's fifth issue and need not address it further herein. 

 Finally, Formosa alleges that the trial court erroneously refused to instruct the jury
on mitigation. The concept of mitigation requires the plaintiff to exercise reasonable care
in minimizing its damages. Great Am. Ins. Co. v. North Austin MUD, 908 S.W.2d 415, 426
(Tex. 1995). The duty to mitigate arises in both contract and tort cases. See Pulaski Bank
& Trust Co. v. Tex. Am. Bank, 759 S.W.2d 723, 735 (Tex. App.-Dallas 1988, writ denied).

The duty to mitigate damages arises only if it can be done with "trifling expense or with
reasonable exertions." Gunn Infiniti v. O'Byrne, 996 S.W.2d 854, 857 (Tex. 1999) (quoting
Walker v. Salt Flat Water Co., 128 Tex. 140, 96 S.W.2d 231, 232 (Tex. 1936)). 

 We reject Formosa's contention that the trial court erred in refusing to instruct the
jury on mitigation. First, there is authority for the proposition that an injured party is not
required to minimize damages resulting from the fraud. Meadolake Foods, Inc. v. Estes,
218 S.W.2d 862, 868 (Tex. Civ. App.-El Paso 1948), writ ref'd n.r.e., 219 S.W.2d 441
(Tex. 1949); see Duperier v. Tex. State Bank, 28 S.W.3d 740, 754 (Tex. App.-Corpus
Christi 2000, pet. dism'd by agmt); New Process Steel Corp., Inc. v. Steel Corp. of Tex.,
Inc., 703 S.W.2d 209, 215 (Tex. App.-Houston [1st Dist.] 1985, writ ref'd n.r.e.).

 Second, Formosa had the burden to show that Kajima did not use ordinary care in
reducing or avoiding its damages. See Moulton v. Alamo Ambulance Serv., 414 S.W.2d
444, 450 (Tex. 1967). To be entitled to a mitigation instruction, the evidence must (1)
clearly show that the plaintiff's decision not to mitigate caused further damages, and (2)
sufficiently guide the jury in determining which damages were attributable to the plaintiff's
decision not to mitigate. Hygeia Dairy Co. v. Gonzalez, 994 S.W.2d 220, 225 (Tex.
App.-San Antonio 1999, no pet.). The defendant does not have to prove an exact amount
of damages attributable to the plaintiff's conduct, but is required to present some evidence
from which the jury can make a reasoned calculation of the losses that occurred due to the
plaintiff's decision not to mitigate. Id. 

 In the instant case, Formosa has failed to meet its burden to show that Kajima's
damages could be mitigated with "trifling expense or with reasonable exertions," that
Kajima's decisions caused further damages, or to produce any evidence from which the
jury could determine which damages were attributable to Kajima. Because Formosa's
proof did not meet these requirements, the court correctly refused the instruction on
mitigation. We overrule Formosa's sixth issue.

VIII. Single Business Enterprise


 Prior to trial, the trial court granted Kajima's motion for partial summary judgment
and found that Formosa USA and Formosa Texas were operating as a single business
enterprise. Accordingly, the jury was instructed that it could consider the conduct of
Formosa Texas when deciding the liability of Formosa USA. 

 In its seventh issue, Formosa contends that the trial court erred by granting a
summary judgment finding that Formosa USA and Formosa Texas operated as a single
business enterprise. Formosa contends that (1) actual fraud is required for a finding of
single business enterprise, (2) single business enterprise is a fact question for the jury, and
(3) even if the issue could be considered as a matter of law, Formosa submitted sufficient
evidence to create a fact issue.

 For the purposes of legal proceedings, subsidiary corporations and parent
corporations are separate and distinct "persons" as a matter of law, and the separate entity
of corporations will generally be observed by the courts even where one company may
dominate or control the other company, or treats the other company as a mere department,
instrumentality, or agency. Valero S. Tex. Processing Co. v. Starr County Appraisal Dist.,
954 S.W.2d 863, 866 (Tex. App.-San Antonio 1997, pet. denied). The "single business
enterprise" theory is an equitable doctrine used to disregard the separate existence of
corporations when the corporations are not operated as separate entities, but rather
integrate their resources to achieve a common business purpose. Old Republic Ins. Co.
v. Ex-Im Servs. Corp., 920 S.W.2d 393, 395-96 (Tex. App.-Houston [1st Dist.] 1996, no
writ). 

 Several intermediate appellate courts, including this Court, have recognized a
concept of "single business enterprise" in one context or another. See, e.g., Nat'l Plan
Adm'rs, Inc. v. Nat'l Health Ins. Co., 150 S.W.3d 718, 744 (Tex. App.-Austin 2004, pet.
filed) (recognizing doctrine as a valid equitable means of piercing the corporate veil to
impose liability); Bridgestone Corp. v. Lopez, 131 S.W.3d 670, 686-87 (Tex. App.-Corpus
Christi 2004, pet. granted, judgm't vacated w.r.m.) (finding exercise of jurisdiction
comported with due process where two corporations operated as a single business
enterprise); El Puerto de Liverpool, S.A. de C.V. v. Servi Mundo Llantero, S.A. de C.V., 82
S.W.3d 622, 636-37 (Tex. App.-Corpus Christi 2002, pet. dism'd w.o.j.) (affirming denial
of special appearance where companies shared common employees, used a centralized
accounting system, and performed services for each other); In re U-Haul Int'l, 87 S.W.3d
653, 657 (Tex. App.-San Antonio 2002, no pet.) (considering the issue of document
production from entities alleged to operate as a single business enterprise); N. Am. Van
Lines, Inc. v. Emmons, 50 S.W.3d 103, 119-21 (Tex. App.-Beaumont 2001, pet. denied)
(recognizing equitable doctrine may apply under exceptional circumstances); Aluminum
Chems. (Bolivia), Inc. v. Bechtel Corp., 28 S.W.3d 64, 68 (Tex. App.-Texarkana 2000, no
pet.) (concluding that appellant had waived issue pertaining to single business enterprise);
Hall v. Timmons, 987 S.W.2d 248, 255-56 (Tex. App.-Beaumont 1999, no pet.)
(concluding that more than a scintilla of evidence supported the jury's finding of a single
business enterprise); Paramount Petroleum Corp. v. Taylor Rental Ctr., 712 S.W.2d 534,
536 (Tex. App.-Houston [14th Dist.] 1986, writ ref'd n.r.e.) (same); see SSP Partners v.
Gladstrong Invs. (USA) Corp.,169 S.W.3d 27, 44 (Tex. App.-Corpus Christi 2005, pet.
filed) (declining to extend the doctrine to a party's vicarious liability for the wrongful acts of
a non-party); see also Allright Tex., Inc. v. Simons, 501 S.W.2d 145, 150 (Tex. Civ.
App.-Houston [1st Dist.] 1973, writ ref'd n.r.e.); Murphy Bros. Chevrolet v. E. Oakland Auto
Auction, 437 S.W.2d 272, 275-76 (Tex. Civ. App.-El Paso 1969, writ ref'd n.r.e.). We
would note that the supreme court has not spoken on the viability of the single business
enterprise theory. See Southern Union Co. v. City of Edinburg, 129 S.W.3d 74, 87 (Tex.
2003) ("We need not decide today whether a theory of 'single business enterprise' is a
necessary addition to Texas law regarding the theory of alter ego for disregarding
corporate structure and the theories of joint venture, joint enterprise, or partnership for
imposing joint and several liability."). 

 Factors to be considered in determining whether separate corporations should be
treated as one enterprise include: (1) common employees; (2) common offices; (3)
centralized accounting; (4) payment of wages by one corporation to another corporation's
employees; (5) common business name; (6) services rendered by the employees of one
corporation on behalf of another corporation; (7) undocumented transfers of funds between
corporations; and (8) unclear allocation of profits and losses between corporations.
Paramount Petroleum Corp., 712 S.W.2d at 536. 

 The purpose of the single business enterprise theory, like the alter ego theory and
other doctrines designed to pierce the corporate veil, is to prevent an inequitable result.
See Castleberry v. Branscum, 721 S.W.2d 270, 271 (Tex. 1986). (6) The courts have
articulated several different rationales for disregarding the corporate fiction, including: (1)
when it is used as a means of perpetrating fraud; (2) where a corporation is organized and
operated as a mere tool or business conduit of another corporation; (3) where it is used to
evade an existing legal obligation; (4) where it is employed to achieve or perpetrate a
monopoly; (5) where it is used to circumvent a statute; and (6) where the corporate fiction
is relied upon as a protection of crime or to justify wrong. Id. at 272. 

 We first address Formosa's assertion that actual fraud is required for a finding of
single business enterprise. Formosa bases its argument on article 2.21(A)(2) of the Texas
Business Corporation Act. See Tex. Bus. Corp. Act Ann. art. 2.21 (A)(2) (Vernon
2003). (7)
 This section provides:

 A. A holder of shares, an owner of any beneficial interest in shares, or
a subscriber for shares whose subscription has been accepted, or any
affiliate thereof or of the corporation, shall be under no obligation to
the corporation or to its obligees with respect to:

 . . .


 (2) any contractual obligation of the corporation or any matter
relating to or arising from the obligation on the basis that the
holder, owner, subscriber, or affiliate is or was the alter ego of
the corporation, or on the basis of actual fraud or constructive
fraud, a sham to perpetrate a fraud, or other similar theory,
unless the obligee demonstrates that the holder, owner,
subscriber, or affiliate caused the corporation to be used for
the purpose of perpetrating and did perpetrate an actual fraud
on the obligee primarily for the direct personal benefit of the
holder, owner, subscriber, or affiliate . . . 


Tex. Bus. Corp. Ann. art. 2.21(A) (Vernon 2003). The 1996 Bar Committee Comment to
article 2.21 of the Texas Business Corporation Act states:

 Castleberry, in particular its use of constructive fraud as a basis of piercing
the corporate veil, was considered by many practitioners to be incorrectly
decided. Further, while questionable in the context of tort claims, the use of
constructive fraud as a means of piercing the corporate veil created a cloud
on the sanctity of contract and the public policy of recognizing corporations
as separate entities apart from their shareholders. In response to
Castleberry, Article 2.21 of the TBCA was amended in 1989 to establish a
clear legislative standard under which the liability of a shareholder for the
obligations of a corporation is to be determined in the context of contractual
obligations and all matters relating thereto.


Id. art. 2.21 cmt. (Vernon 2003); see Willis v. Donnelly, 199 S.W.3d 262, 272 (Tex. 2006). 
Under the current statute, a shareholder "may not be held liable to the corporation or its
obligees with respect to . . . any contractual obligation of the corporation . . . on the basis
that the holder . . . is or was the alter ego of the corporation or on the basis of actual or
constructive fraud, a sham to perpetrate a fraud, or other similar theory . . . unless the
shareholder caused the corporation to be used for the purpose of perpetrating and did
perpetrate an actual fraud on the obligee primarily for the direct personal benefit of the
shareholder. . . ." Id. art. 2.21(A); see Willis, 199 S.W.3d at 272. (8)
 The statute is the
"exclusive" means for imposing liability on a corporation for the obligations of another
corporation in which it holds shares. S. Union Co., 129 S.W.3d at 87; see Willis, 199
S.W.3d at 272 (providing that the liability of a shareholder for a contractual corporate debt
under this statute "is exclusive and preempts any other liability imposed for that obligation
under common law or otherwise") (citing current § 21.224). The references to "alter ego"
and "other similar theory" in the current statute were added in 1993 amendments to the
Business Corporation Act. Willis, 199 S.W.3d at 272; see Act of May 7, 1993, 73d Leg.,
R.S., ch. 215, § 2.05(A)(2), 1993 Tex. Gen. Laws 418, 446. There are statutory exceptions
to this general rule, as for example, where the shareholder expressly agrees to be
personally liable to the obligee for the obligation. Tex. Bus. Corp. Act. Ann. art. 2.21(B)(1)
(Vernon 2003); see now Tex. Bus. Orgs. Code Ann. § 21.225(1). 

 Article 2.21 applies to contractual obligations "or any matter relating to or arising
from the obligation." Although this matter was submitted to the jury on the issue of fraud,
the fraud at issue arises from the contracts between the parties. Accordingly, we assume,
without deciding, that this is a matter relating to or arising from the contracts. Thus, we
further assume that article 2.21 applies to the instant case. 

 Utilizing the language of article 2.21, if this case involved a contract signed by
Formosa Texas, then Formosa USA would be under no obligation to Formosa Texas or
Kajima with respect to any contractual obligation of Formosa Texas, or any matter relating
to or arising from that obligation, on the basis that Formosa USA is a single business
enterprise with Formosa Texas, unless Kajima demonstrated that Formosa USA caused
Formosa Texas to be used for the purpose of perpetrating and did perpetrate an actual
fraud on Kajima, primarily for the direct personal benefit of Formosa USA. 

 However, that is not the case now before the Court.

 Based on the facts before this Court, we conclude that article 2.21 does not apply
in the instant case because the contracts were signed by Formosa USA, not Formosa
Texas, its wholly owned subsidiary. There is no Formosa Texas contract. Formosa Texas
is not a party to the contracts at issue in this case.

 Moreover, in the instant case, the jury found Formosa USA guilty of its own fraud. 
As discussed herein, evidence supports the jury's finding that Formosa USA committed
fraud. Because the evidence of Formosa USA's own fraud is sufficient to support the jury's
finding that Formosa USA committed fraud, Formosa has not been harmed by the trial
court's ruling on the single business enterprise.

 In its next two subissues, Formosa contends that whether a single business
enterprise exists is a fact question for the jury, and even if the issue could be considered
as a matter of law, Formosa submitted sufficient evidence to create a fact issue. As an
initial matter, we note that appellate courts have considered single business enterprise to
be a matter of law. See Allright Tex., Inc. v. Simons, 501 S.W.2d 145, 150 (Tex. Civ.
App.-Houston [1st Dist.] 1973, writ ref'd n.r.e.); see also Murphy Bros. Chevrolet Co. v. E.
Oakland Auto Auction, 437 S.W.2d 272, 276 (Tex. Civ. App.-El Paso 1969, writ ref'd
n.r.e.). However, whether or not single business enterprise is a fact issue for the jury or
an issue that can be established as a matter of law, we conclude that Kajima offered
sufficient evidence for the trial court to grant a partial summary judgment resolving that
Formosa USA and Formosa Texas should be treated as one enterprise. 

 The companies had common employees during the relevant period of time, such
as Susan Wang, executive vice president for both companies. The companies shared
common offices at 9 Peach Tree Hill Road, Livingston, New Jersey 07039. With regard
to the project at issue, the companies had a centralized or coordinated accounting system
to the extent they related to approval of construction change orders with regard to the
project. Both companies shared a common business name: "Formosa." Employees of
one corporation rendered services on behalf of the other. Glenn Dobbs, an employee of
Formosa Texas, performed bid analyses for Formosa USA on the construction project. 
Robert Hsueh and Simon Chang, both employees of Formosa Texas, reported to L.F. Pan,
who was employed by Formosa USA. The director of legal services for Formosa Texas,
Camp Mehrens, reported to Jack Wu, an officer of both Formosa Texas and Formosa
USA. Another employee, Jack Huang, testified he was not sure if he worked for Formosa
USA or Formosa Texas on the Point Comfort project. Another employee, Jeff Tseng,
testified he did not understand the differences between Formosa USA and Formosa Texas. 

 Considering these facts and comparing them to the factors enunciated in Paramount
Petroleum Corp. v. Taylor Rental Ctr., for determining whether separate corporations
should be treated as one enterprise, we conclude that Kajima met its burden of showing
both no genuine issue of material fact and entitlement to partial judgment as a matter of
law on the issue of single business enterprise. See Tex. R. Civ. P. 166a(c); Paramount
Petroleum Corp., 712 S.W.2d at 536. We overrule Formosa's seventh issue.

IX. Withholding Evidence


 In its eighth issue, Formosa alleges that the trial court erred by withholding
documentary evidence from the jury during its deliberations even though the documents 
had been admitted into evidence. Formosa's complaint concerns twenty-seven volumes
of CTCI drawings, engineering design drawings used to bid and build the CM 903 project. 
Formosa contends that these drawings were the center of Kajima's fraud claim insofar as
Kajima asserted that the drawings were defective, Formosa knew they were defective, and
Formosa withheld that information from Kajima. In contrast, Formosa contended that the
expert testimony indicated the CTCI drawings were suitable to bid and build the project. 
Accordingly, Formosa contends that the documents were crucial for the jury to review. 
Kajima argues that the drawings, other than those included in the CM 903 bid package,
were not in evidence. The trial court allowed the jury to have only the drawings that were
part of the CM 903 bid package. 

 Texas Rule of Civil Procedure 281 provides that:

 The jury may, and on request shall, take with them in their retirement the
charges and instructions, general or special, which were given and read to
them, and any written evidence, except the depositions of witnesses, but
shall not take with them any special charges which have been refused. 
Where part only of a paper has been read in evidence, the jury shall not take
the same with them, unless the part so read to them is detached from that
which was excluded.


This rule is mandatory, and the trial court is required to send all exhibits admitted into
evidence to the jury room during deliberations. First Employees Ins. Co. v. Skinner, 646
S.W.2d 170, 172 (Tex. 1983). However, any error in failing to send exhibits to the jury
room during deliberations does not call for reversal unless the error probably caused the
rendition of an improper judgment. See Tex. R. App. P. 44.1(a)(1).

 In this case, the reporter's record does not indicate that all of the drawings were
admitted into evidence. In fact, earlier in the trial, the trial court did not allow some of the
drawings to be published to the jury on grounds that they were not part of the contract. 
Accordingly, the trial court did not err. Even if the trial court erred; however, we cannot
conclude that any alleged error probably caused the rendition of an improper judgment. 
We overrule Formosa's eighth issue.

X. Prejudgment Interest


 In its ninth and final issue, Formosa contends that the trial court erred by awarding
Kajima excessive prejudgment interest. Specifically, Formosa contends that, under
Johnson & Higgins of Tex., Inc. v. Kenneco Energy, Inc., 962 S.W.2d 507 (Tex. 1998), the
trial court should have applied section 304.105 of the Texas Finance Code to reduce
Kajima's claim for prejudgment interest. See Tex. Fin. Code Ann. § 304.105 (Vernon
2006). Section 304.105(b) provides, in part, that:

 If judgment for a claimant is more than the amount of a settlement offer of
the defendant, prejudgment interest does not accrue on the amount of the
settlement offer during the period the offer may be accepted.


Id. § 304.105(b). Formosa contends that it made several settlement offers to Kajima,
including an offer of $15,361,000, and the trial court should not have awarded prejudgment
interest for the relevant periods of time during which the offers could have been accepted.

 There are two legal sources for an award of prejudgment interest: (1) common law
equitable principles; and (2) an enabling statute. Johnson & Higgins of Tex., Inc., 962
S.W.2d at 528 (Tex. 1998). In Johnson & Higgins, the Texas Supreme Court recognized
that the statutory prejudgment interest scheme conflicted in several respects with the
common law regarding prejudgment interest. Id. at 528-31. Accordingly, the court
harmonized certain aspects of the common law prejudgment interest accrual scheme to
accord with that found in the finance code. Id.; City of Houston v. Texan Land & Cattle
Co., 138 S.W.3d 382, 388 (Tex. App.-Houston [14th Dist.] 2004, no pet.). Specifically, the
Texas Supreme Court (1) changed the common law accrual date for prejudgment interest
to match that ordered by statute, (2) ordered that prejudgment interest be computed as
simple interest, as in the statute, rather than as compound interest, and (3) made the
prejudgment interest rate the same as the postjudgment interest rate, again, as in the
statute. Johnson & Higgins of Tex., Inc., 962 S.W.2d at 531-32.

 Formosa contends that Johnson & Higgins mandates the application of section
304.105(b) to this case. The express language of the finance code indicates otherwise. 
Chapter 304 of the finance code governs judgment interest. See generally Tex. Fin. Code
Ann. §§ 304.001-.302 (Vernon 2006). Section 304.101 of the code provides that
subchapter B, which governs prejudgment interest, "applies only to a wrongful death,
personal injury, or property damage case of a court of this state." Id. § 304.101. Section
304.105, addressing the effect of a settlement offer on the accrual of prejudgment interest,
is part of subchapter B, and accordingly, applies only to wrongful death, personal injury,
or property damage cases. Id. § 304.105. The instant case is not a case for wrongful
death, personal injury, or property damage; accordingly, section 304.105 does not apply. 
See id.

 Contrary to Formosa's argument, nothing in Johnson & Higgins can be read to
require the application of section 304.105(b) to this case. In fact, in Johnson & Higgins,
the supreme court itself rejected the wholesale application of the finance code to all
common law cases. "We hold that section 6 means what it says: statutory prejudgment
interest applies only to wrongful death, personal injury, and property damage cases." See
Johnson & Higgins of Tex., Inc., 962 S.W.2d at 530. Moreover, this argument has
previously been rejected by the Texarkana Court of Appeals. Head Indus. Coatings &
Servs., Inc. v. Maryland Ins. Co., 981 S.W.2d 305, 311 (Tex. App.-Texarkana 1998, pet.
denied); see De La Garza v. De La Garza, 185 S.W.3d 924, 928 (Tex. App.-Dallas 2006,
no pet.) (stating that prejudgment interest under the finance code applies only to wrongful
death, personal injury, and property damage cases). (9) Accordingly, we overrule Formosa's
ninth and final issue.

XI. Conclusion


 We conclude that Formosa failed to meet its burden of proof to disqualify Hutchison,
and, accordingly, we overrule Formosa's third issue. We also overrule the remainder of
Formosa's issues on appeal. We affirm the judgment of the trial court. 

 

 ROGELIO VALDEZ,

 Chief Justice


Dissenting opinion by Justice Yanez, joined by Justice Hinojosa.


Concurring opinion by Justice Castillo.


Opinion on Rehearing En Banc

delivered and filed this 28th day of December, 2006. 
1. Prior to the trial of this matter, Hutchison's corporation, A. W. Hutchison & Associates, Inc., merged
with A. W. Hutchison & Associates of California, Inc., which employed Huyghe. 

2. This two-part test was first set forth in Paul v. Rawlings Sporting Goods Co., 123 F.R.D. 271, 278
(S.D. Ohio 1988), and later framed by Wang Laboratories, Inc. v. Toshiba Corp., 762 F. Supp. 1246, 1248
(E.D. Va. 1991). 
3. According to testimony from counsel with Jones Day, the firm had not yet made a decision regarding
whether it would designate Huyghe as a testifying expert or utilize him as a consulting expert when meeting
with Huyghe. The law is abundantly clear that the subject matter on which an expert witness is expected to
testify, the mental impressions and opinions held by the expert and the facts known to the expert (regardless
of when the factual information was acquired) which relate to or form the basis of the mental impressions and
opinions held by the expert, are discoverable. See Tex. R. Civ. P. 166b(2)(e); see also Tex. R. Civ. P.
166b(3)(b); In re Am. Home Prods. Corp., 985 S.W.2d 68, 73 (Tex. 1998). Discoverable information is not,
by definition, "confidential information" as contemplated by the Koch test.

4. The party seeking to exclude the expert's testimony must offer more than mere argument; it must
offer some proof of the alternative methodologies or proof of the weakness of the methodology used:


 GM's lawyers lampoon the methods Syson used to test the sun visor and to reach
conclusions about the engineering compromises that would optimize a sun visor's 
performance in light of the risks involved. But their cri de coeur is not backed up by
references to any body of scientific knowledge. What tests do engineers use to resolve
questions of the kind Syson addressed? What tests should he have performed? What data
did he overlook? Counsel apparently want appellate judges to make a priori judgments about
how scientific inquiry should be conducted. That way quackery lies. A profession resolves
questions of method in the same way it reaches conclusions about other empirical issues;
which method is best is a question itself subject to scientific inquiry . . . . A litigant that wants
a court of appeals to set aside a district judge's decision to admit expert testimony has to do
more than appeal to a lawyer's sense of how science should be done. 


DePaepe v. GMC, 141 F.3d 715, 720 (7th Cir. 1998); see also Zenith Elecs. Corp. v. WH-TV Broad. Corp.,
395 F.3d 416, 419 (7th Cir. 2005) (noting that Daubert analysis "will not do to stop with lawyers' arguments
pro and con, for these may fail to appreciate the difficulties that bona fide experts encounter. Scientific
decisions must be made by scientific rather than rhetorical means.").

5. If Formosa's misinterpretation of Casteel were correct, even a simple car wreck case would require
a granulated submission of whether the defendant driver was negligent in failing to keep a proper lookout,
negligent in failing to maintain a safe speed, negligent in failing to remain in the proper lane of traffic, negligent
in steering, negligent in failing to apply the brakes, etcetera. See Crown Life Ins. Co. v. Casteel, 22 S.W.3d
378, 388 (Tex. 2000).
6. Castleberry is cited herein for its historical discussion of the origins of these theories, but it has been
largely superceded by subsequent statutory amendments. Compare Castleberry v. Branscum, 721 S.W.2d
270 (Tex. 1986); with Tex. Bus. Orgs. Code § 21.223 (Vernon Supp. 2006) (effective January 1, 2006).
7. The elements necessary to impose personal liability on a shareholder have been carried forward
in section 21.223 of the Business Organizations Code. See Tex. Bus. Org. Code Ann. § 21.223 (Vernon Supp.
2006). That code became effective January 1, 2006, however, the Business Corporation Act continues in
effect until January 1, 2010 for corporations formed before January 1, 2006.

8. We note that case law is divided regarding whether actual fraud is required for vicarious liability
under the statute. Some cases, including cases decided by this Court, have held that no proof of fraud is
required to recover under a single business enterprise theory because the single business enterprise theory
relies on equity, similar to partnership principles of liability. See, e.g., PHC-Minden, L.P. v. Kimberly-Clark
Corp., 202 S.W.3d 193 (Tex. App.-Tyler 2005, pet. granted); Bridgestone Corp. v. Lopez, 131 S.W.3d 670,
682 (Tex. App.-Corpus Christi 2004, pet. granted, judgment vacated w.r.m.); N. Am. Van Lines, Inc. v.
Emmons, 50 S.W.3d 103, 119 (Tex. App.-Beaumont 2001, pet. denied) (citing Aluminum Chems. (Bolivia),
Inc. v. Bechtel Corp., 28 S.W.3d 64, 68 (Tex. App.-Texarkana 2000, no pet.)). Other courts have refused to
apply the statute to tort cases and have limited its application to contract cases. See, e.g., Love v. State, 972
S.W.2d 114, 118 (Tex. App.-Austin 1998, pet. denied) ("The Act itself makes clear that actual fraud is
required only in the context of contractual obligations."). Other cases require actual fraud in any context. See,
e.g., Menetti v. Chavers, 974 S.W.2d 168, 174 (Tex. App.-San Antonio 1998, no pet.) ("A finding that no
actual fraud was committed destroys not only the attempt to pierce the corporate veil by a showing of an alter
ego, but by "other similar theories."). Because our disposition of Formosa's argument does not rely on any
of these approaches, we need not and will not attempt to reconcile these cases herein.

9. Although not cited by Formosa in its brief, we note that dicta in Shoreline, Inc. v. Hisel, 115 S.W.3d
21 (Tex. App.-Corpus Christi 2003, pet. denied), discusses the application of certain sections of chapter 304
of the finance code to an employment discrimination case. See id. at 24-25. Shoreline is distinguishable
from the instant case insofar as it concerns the finality of a judgment that failed to specify the amount of
prejudgment interest due on a judgment. See id. To the extent that the dicta therein could be construed to
indicate that sections of the finance code are applicable to causes of action other than wrongful death,
personal injury, or property damage, we would hereby disapprove it.